MANN THEATRES CORPORATION OF CALIFORNIA et al., Respondents, v MID-ISLAND SHOPPING PLAZA CO., as Successor in Interest to MID-ISLAND SHOPPING PLAZA, INC., Appellant, MID-PLAZA ASSOCIATES, as Successor in Interest to MID PLAZA CINEMA, INC., et al., Respondents. (Action No. 1.)

MID-ISLAND SHOPPING PLAZA Co., Appellant, v MID PLAZA CINEMA ASSOCIATES et al., Respondents. (Action No. 2.)

Second Department, June 20, 1983

APPEARANCES OF COUNSEL

*Jaspan, Kaplan, Levin & Daniels* (*A. Thomas Levin* and *Theodore Daniels* of counsel), for appellant.

*Raferty, Grainger, Rosenbloom & Drew* (*John Drew* and *Edmund C. Grainger, III,* of counsel), for Mann Theatres Corporation of California and another, respondents.

*Milton Popper* for Mid Plaza Cinema Associates, respondent.

OPINION OF THE COURT

LAZER, J.

The principal issue in these consolidated actions for declaratory relief and to recover possession of real property is whether a theatre lease which prohibited the tenant from assigning, subletting or permitting the premises to be "used by others" was violated by an "operating agreement" under which a permitted subtenant arranged for another entity to occupy and operate the demised twin theatres. Although we conclude that the lease was violated to a degree that warranted cancellation, time to cure the violation still remains.

I

In March of 1963 Mid-Island Shopping Plaza, Inc., as landlord, and Sidney Sinetar and Seymour Frank, as tenant, executed a 25-year ground lease which gave the tenant a 15-year renewal option but required it to construct a movie theatre at its own expense. At the time of the events in current issue, the theatre originally built by the tenant had been transformed into twin theatres with a seating capacity of 2,000. The lease contained the following paragraph: "11. Tenant and Tenant's distributees and legal representatives, successors and assigns, shall not assign, mortgage or encumber this agreement, mortgage, underlet

or use or permit any part of the demised premises to be used by others, whether voluntarily or by operation of law or otherwise, without the prior written consent of Landlord in each instance. Any consent by Landlord to an assignment or underletting shall not in any manner be construed to relieve Tenant or any assignee or undertenant from obtaining the consent in writing of Landlord to any further assignment or underletting." The tenant subsequently assigned the ground lease to Mid-Plaza Cinema, Inc., which, in 1966, sublet the premises to Fox Theatres Corporation pursuant to an agreement which provided for an annual minimum rent and an overage deriving from the subtenant's operations. In 1973 the sublease was assigned to Mann Theatres Corporation of California. All of these transactions had the landlord's consent.

By 1980 Mann, whose business involved the operation of numerous motion picture theatres, decided to discontinue its east coast activities. In April of 1980, to effectuate this intention, Mann assigned all of its east coast leases, including the instant one, to Brighton Theatres Corporation. The assignment agreement specified that if Mann were unable to procure any landlord's consent to assignment, Mann and Brighton would execute an "operating agreement" relative to the theatre involved. Thereafter, without obtaining the landlord's consent to Mann's assignment of its sublease, Mann entered into an agreement dated May 2, 1980, by which it granted Brighton the "irrevocable right to operate" the twin theatres on Mann's behalf for the remaining term of the sublease including any extensions. The agreement provided for Brighton to perform all of the subtenant's obligations under the sublease, furnish a liability policy in the amount of $5,000,000 and pay the rent, including the overages, to Mann, which would in turn pay these sums to the master tenant. All profits from the theatre operations were to be retained by Brighton, which was also responsible for all losses and expenses. The agreement became effective immediately, with Mann theatre personnel becoming the employees of Brighton.

On July 10, 1980 the landlord's attorneys sent notices to the master tenant, and to Mann and Brighton, asserting that "[i]t has come to our client's attention that the sub-

lease [to Mann] has been further assigned, transferred, underlet or sold by Mann Theatres Corp. to another or different entity which is presently operating the Twin Theatres". The notices went on to say that under the terms of the lease, and specifically paragraph 11, the sublease was "not permitted to be assigned or underlet without the prior written consent of our client". The landlord declared the lease in default, gave the tenant 10 days to cure the deficiency, and stated that if the tenant failed to do so, the lease would end on July 23, 1980. In a letter dated July 21, 1980 the time to cure was extended to August 8, 1980.

Before the time to cure elapsed, Mann and Brighton commenced this action against the landlord, the master tenant and the original tenants, seeking a declaration that the execution of the May agreement did not constitute a default under the ground lease. The landlord's answer alleged violation of the ground lease, but the master tenant failed to answer.* Mann and Brighton also moved for a preliminary injunction and obtained a temporary restraining order tolling the cure period pending the hearing of the motion. But when the motion was heard on August 14, 1980, the toll was not extended, and it was not until September 3, 1980 that Special Term granted the preliminary injunction and ordered the cure period tolled pending determination of the action. Treating the cure period as having expired during the time between the return date of the motion and its determination, the landlord commenced a summary proceeding in the Nassau County District Court against the master tenant, Mann and Brighton (all hereafter referred to as the tenancy interests) seeking to recover possession of the premises. The tenancy interests answered by contending that the lease had not been violated because the agreement between Mann and Brighton did not constitute an assignment, subletting, or permission for use of the premises by others. The summary proceeding was subsequently removed to the Supreme Court for joint trial with the declaratory judgment action.

---

* It did, however, file an affidavit by its partner, Seymour Frank, who alleged that he informed Mann that before the takeover by Brighton could be approved by the tenant, Brighton's parent company, Cinema V, would have to "obligate itself" on the lease and sublease. At the trial, he testified that Cinema V had agreed to this condition but the record reflects no evidence of any written guarantee of any nature from Cinema V.

On January 1, 1981, before the trial took place, Mann and Brighton entered into a second agreement which superseded the May 2, 1980 agreement. The new agreement provided that it was to be effective for five years and annually thereafter unless terminated by written notice given at least six months before the end of a lease year. Brighton was to collect all receipts, make all repairs (with permission required for expenditures in excess of $10,000), employ all personnel on terms and conditions comparable to other Long Island theatres, obtain insurance and necessary permits, buy and book motion pictures, and pay all expenses (except rent). If theatre receipts became insufficient at any time to pay current expenses, Mann was to advance Brighton the necessary funds. While Brighton could commingle receipts from the Mid-Island theatres with its other funds, net profits were to be forwarded to Mann quarterly, less a fee of 6% of the gross receipts which Brighton was to retain. Brighton was given complete authority over the booking of films and the entertainment policy of the theatres.

Following the trial, Special Term rendered judgment declaring that the agreement of May 2, 1980 did not constitute an assignment or sublease and that the ground lease had not been defaulted. The court also declared that exclusive possession of the premises had not been transferred to Brighton under the agreement and it dismissed the summary proceeding. This appeal is from that judgment.

II

It scarcely bears repetition to note that in the absence of statute or an express restriction in a lease, a tenant has the unrestricted right to assign or sublet (*Eten v Luyster,* 60 NY 252). But where the lease contains an express provision restricting assignment or subletting without the landlord's consent, the landlord may arbitrarily refuse consent for any or for no reason (*Dress Shirt Sales v Hotel Martinique Assoc.,* 12 NY2d 339; but see Real Property Law, § 226-b as to residential leases), unless the provision requires that consent not be unreasonably withheld. Since provisions limiting assignment or underletting are a restraint on the free alienation of land, they are not favored by the law, and are to be strictly construed (*Rowe v Great*

*Atlantic & Pacific Tea Co.,* 46 NY2d 62, 69; *Riggs v Pursell,* 66 NY 193, 201). Nevertheless, landlords are entitled to the enforcement of such provisions because of their substantial interest in controlling the assignability of leases (*Glauberman v University Place Apts.,* 188 Misc 277, affd 272 App Div 758). Restrictions against alienation provide landlords with the opportunity to assess the financial responsibility and "business character" of any proposed assignee or subtenant, as well as the legality of the proposed use and the nature of the occupancy (*American Book Co. v Yeshiva Univ. Dev. Foundation,* 59 Misc 2d 31, 33). We spurn as pure sophistry the tenancy interests' claim that the restrictions effect only the ground lease and not the sublease. A subtenant is always bound by the terms of the underlying lease, which is the source of its rights (*World of Food v New York World's Fair 1964-1965 Corp.,* 22 AD2d 278; *Bartholdi Realty Co. v Robard Realty Co.,* 156 App Div 528), and the instant restriction is broad in scope, binding the tenant's assignees or undertenants (see *Putch v Jacard Realty Co.,* 44 Misc 2d 177; see, also, *Francis v Ferguson,* 246 NY 516; *Lynch v Joseph,* 228 App Div 367).

Paragraph 11 of the ground lease prohibits three types of grants by the tenant: assignment, subletting, and permitting "any part of the demised premises to be used by others". The "used by others" restriction, while broad in scope, seems primarily directed at licensing devices which might not be foreclosed by the prohibitions against assignment or sublease. A clause which forbids only assignment and sublease does not prevent the granting of a license (*Layton v Namm & Sons,* 275 App Div 246, affd 302 NY 720) — which is a "privilege * * * to do one or more acts upon land without possessing any interest therein" (*Greenwood Lake & Port Jervis R. R. Co. v New York & Greenwood Lake R. R. Co.,* 134 NY 435, 440). A restriction against use of the property by others closes the gap by prohibiting the granting of licenses (see Restatement, Property 2d, § 15.2, Reporter's Note 5, p 109). The Restatement reporter supports this view with a Missouri case in which a clause remarkably similar to the current one declared: " 'This lease is not assignable, nor shall said

premises or any part thereof be sublet, used or permitted to be used, without the written consent of the lessor'" (see *Singer v Krohnberg,* 294 SW 728, 729 [Mo]).

While the permission given to an employee or other agent to enter on the land may be deemed a license (3 Tiffany, Law of Real Property [3d ed], § 829; see, also, *Snow v Winn,* 607 P2d 678 [Okla]), it is apparent that the "used by others" provision of paragraph 11 cannot bar the tenant's employees or agents from using the premises because under such circumstances possession and control remain with the tenant (see *Presby v Benjamin,* 169 NY 377). No semblance of rationale can support a restriction which would prevent a tenant from placing its employees or agents in demised premises while maintaining possession and control. United in interest and in their approach to this litigation, the tenancy interests thus seek escape from the all-embracing scope of paragraph 11 by contending that Brighton merely was Mann's agent in the operation of the theatres and that no portion of paragraph 11 has been violated.

### III

■ We turn, then, to the actual character of the May, 1980 agreement. Since the label its parties gave it is not controlling (*Statement, Inc. v Pilgrim's Landing,* 49 AD2d 28, 33), the fact that the agreement was referred to as an "operating agreement" did not transform it into one (*Dubay v Trans-America Ins. Co.,* 75 AD2d 312, 317). What is determinative of an agreement's nature are the rights the agreement confers (*City of New York v Pennsylvania R. R. Co.,* 37 NY2d 298, 300). In our view, the agreement constituted an assignment of Mann's sublease; it had the essential attributes of an assignment because it yielded the exclusive possession and control of the premises to Brighton and contained no reversionary provision (*City of New York v Pennsylvania R.R. Co., supra; Stewart v Long Is. R. R. Co.,* 102 NY 601; *Williams v Hylan,* 223 App Div 48, affd 248 NY 616; Restatement, Property 2d, § 15.1, Comment *i*). No employment or agency relationship was created because Mann retained no interest in the business and Brighton's right to keep the profits and to assume the losses of the operation of the theatres was totally inconsis-

tent with such relationships. Mann's sole function, once it was paid for its signature on the agreement, was ministerial — to transmit Brighton's rent and overage payments to the master tenant. Although we find no New York cases dealing with the type of arrangement entered into here, sister States that have had the experience have rejected the theory of agency and license and held such contracts to constitute assignments or sublettings (see *Lemons v Knox,* 72 Ariz 177; *Frasier v Witt,* 62 Cal App 309; *Stevenson v Dersam,* 275 Pa 412; *Bedgisoff v. Morgan,* 23 Wn 2d 737; *Cranston v Bluhm,* 33 Wis 2d 192). The *Bedgisoff* court declared (p 745): "the 'managers' were to receive all the profits. This is inconsistent with the contention that the original lessees still have an interest in the business. This is not the case where an owner hires another to manage his business and pays this other a percentage of the profits, and still has an interest in the business and his income fluctuates with the profits."

The trial record reveals that neither Mann nor its employees ever visited the premises nor exercised any control over the business (see *Lemons v Knox, supra; Bedgisoff v Morgan, supra*), and therefore it is not only the language of the agreement but also the record that demonstrates that Brighton was not Mann's manager. Brighton alone was responsible for hiring and firing of theatre personnel, the films to be shown, and the payment of expenses. Palpably, Brighton was not acting as Mann's agent, but on its own behalf. Since we are aware that there was a strong motive for concealing the true character of the agreement (see *Bedgisoff v Morgan,* 23 Wn 2d 737, 744, *supra;* Jones, Landlord & Tenant, § 442), we conclude that the May, 1980 "operating agreement" was merely a "thinly veiled attempt to conceal [a] deliberate evasion of [the] covenant not to [assign]" (*Frasier v Witt, supra,* p 313).

IV

Without conceding that the May, 1980 agreement violated the lease, the tenancy interests argue that, if it did, the deficiency was cured by the successor agreement of January 1, 1981. While the landlord claims that the power to cure the violation was irretrievably lost prior to execution of the new agreement — a contention we will shortly

reject — we find that the 1981 agreement merely continues the violation of the paragraph 11 prohibition. Under the new agreement, Brighton continues to exercise complete control over the operation of the theatres without any provision for supervision, direction, input or even presence by Mann. Although the agreement alters the formula by which Brighton pays Mann and the latter purports to assume some financial risk, at a minimum the agreement gives Brighton a license to use the premises. Unfortunately for the tenancy interests, the use the 1981 agreement affords is a "use by others" in contravention of paragraph 11. A tenant cannot cure a violation of a lease by creating another violation, especially when both violations derive from the same leasehold restriction. Although the violation has not been cured, we must still dispose of several technical and substantive questions the tenancy interests have raised, and ultimately we must explain our conclusion that there is still time to cure the violation.

V

■ We view as meritless the claim that the notice to terminate the lease was ineffective because it was sent by the attorney for the landlord. In this respect, the tenancy interests rely on nisi prius decisions to the effect that since a tenant is entitled to an unequivocal notice, it should not be placed in a position of peril if the lease lacks a provision for notice by an attorney (*185 East 85th St. Co. v Gravanis,* NYLJ, Jan. 21, 1981, p 6, col 2; *Granet Constr. Corp. v Longo,* 42 Misc 2d 798; *747 So. Blvd. Realty Corp. v Wein-Rose,* 201 Misc 552; *Matter of Lendon Realty Corp. [Weber],* 193 Misc 120; *Mesaba Constr. Co. v 46th St. Serv. Sta.,* 68 NYS2d 751). Not only does *Reeder v Sayre* (70 NY 180, 188) provide dicta contrary to the cited cases, but the cases themselves are distinguishable from the instant case, where the lease provides for notice by an agent and where the landlord's lawyer was accepted by the tenancy interests. Not only was the notice never rejected, but the tenancy interests negotiated an extension of the cure period with the lawyer (see *Matter of Adelman v Applefield,* 22 Misc 2d 95).

The tenancy interests also argue that the landlord is estopped from claiming that Brighton was an assignee,

since at a traverse hearing in the summary proceeding, the landlord had contended that Brighton was Mann's managing agent. The District Court upheld the service on Brighton as effective to obtain jurisdiction over Mann and no appeal was taken. The estoppel contention fails on several grounds. First, the subtenant committed the same sin by asserting at the traverse hearing that Brighton was not acting as Mann's agent, contrary to the current claim. Second, while inconsistent positions in litigation may result in an estoppel, here the tenancy interests were not misled to their prejudice and there was no reliance or change in position (see *Lynn v Lynn,* 302 NY 193, 205; *Van Dussen-Storto Motor Inn v Rochester Tel. Corp.,* 63 AD2d 244, 249).

We reach then the nettlesome issue of whether the tenancy interests have time to cure the default. The landlord argues that the lease provides no right to cure a paragraph 11 violation and that, in any event, Special Term had no power to revive a cure period which expired as a consequence of its failure to continue the temporary restraining order on the hearing date of the motion for a preliminary injunction. The notice to cure gave the tenancy interests 10 days to cure the default and 20 days expired between the hearing and Special Term's subsequent grant of a temporary injunction tolling the time to cure. The landlord's first contention is easily disposed of, for while it is true that the lease contains no provision for cure of a paragraph 11 violation, a cure period was created when the landlord's notice fixed a time to cure and the tenancy interests adopted it (see *Wuertz v Cowne,* 65 AD2d 528). Whether the cure period expired during the pendency of the preliminary injunction motion is more difficult to resolve.

Under the procedure promulgated in *First Nat. Stores v Yellowstone Shopping Center* (21 NY2d 630), a tenant may obtain a restraining order which tolls the running of the notice to cure until a declaration of the parties' rights may be had (*Podolsky v Hoffman,* 82 AD2d 763; *Health 'N Sports v Providence Capitol Realty Group,* 75 AD2d 884; *150 East 57th St. Assoc. v Fletcher,* 35 AD2d 947). In *Yellowstone* (*supra*), the tenant's failure to obtain a re-

straining order until after the cure period had run was fatal since there is no judicial power to revive a cure period that has expired (*First Nat. Stores v Yellowstone Shopping Center, supra,* p 637). Absent a toll of the cure period, a judicial determination that the lease has been violated leaves the tenant without the ability to cure (*Wuertz v Cowne, supra*) if the time to cure has elapsed by the time of decision. Therefore, a tenant who fails to seek a restraining order tolling the time to cure must either cure during the time limited or litigate under the peril that a negative determination of the substantive issues will destroy the leasehold without a further opportunity for cure (*Schuller v D'Angelo,* 117 Misc 2d 528; Sadowsky, Forfeiture of Leases: A Trap for the Unwary, NYLJ, Dec. 31, 1970, p 1, col 4).

■ Here, the tenancy interests moved expeditiously to toll the cure period by obtaining an ex parte temporary restraining order pending the hearing of their motion for injunctive relief prior to the termination date set forth in the landlord's notice. Thereafter, even though a bond was posted and the moving papers requested a continuation of the restraining order, Special Term failed to continue the toll on the date of the hearing of the motion and it is now argued that the time expired before the temporary injunction was issued. Unlike *Yellowstone* (*supra*), where no restraint was obtained, the instant tenancy interests obtained a temporary order prior to expiration of the cure period but the order was permitted to lapse either by judicial error, inadvertence or the assumption that a subsequently issued preliminary injunction order would continue the former ex parte toll. In declining to hold the lapse fatal, we adopt the result in *Physicians Planning Serv. Corp. of Conn. v 292 Estates* (88 AD2d 852) where Special Term's erroneous refusal to grant a timely sought temporary restraining order to toll a cure period did not result in the extinction of the time to cure. In similar fashion, we now hold that an erroneous or inadvertent failure to continue a properly granted ex parte toll will not extinguish a tenant's opportunity to cure, if the appellate tribunal ultimately decides that the toll should have been continued. Despite our determination that the lease has been violated,

we conclude that on the basis of the showing made in their moving papers, the tenancy interests were entitled to an interim toll pending resolution of the substantive issues in the case (see *Finley v Park Ten Assoc.,* 83 AD2d 537).

In so deciding, we rely on the fact that the *Yellowstone* rule is equitable in nature, and in equity the erroneous denial of a timely sought temporary toll or the inadvertent failure to continue one already granted, should not result in the forfeiture of a leasehold, even if the tenant has failed to obtain a further temporary restraint pending appeal (see, e.g., *Physicians Planning Serv. Corp. of Conn. v 292 Estates, supra; Madison Ave. Specialties v Seville Enterprises,* 40 AD2d 784; *150 East 57th St. Assoc. v Fletcher,* 35 AD2d 947, *supra*). That is not to say that a further temporary restraint pending appeal lacks purpose. The failure to obtain such a restraint places the tenant entirely at the mercy of the appellate court, for if it is decided that the denial of the original toll application was warranted, no further time will be available to effect a cure. A successful appeal, however, restores to the tenant whatever cure time remained when the original temporary toll application was made. Since the instant tenancy interests did obtain a timely temporary restraining order, they still may cure their violation within the time that remained for cure when their original toll order was obtained. There is no merit, however, to their contention that a separate notice to terminate will be required of the landlord once the cure time expires. Unlike the cases cited by the tenancy interests (see *Kirschenbaum v M-T-S Franchise Corp.,* 77 Misc 2d 1012; *Granet Constr. Corp. v Longo,* 42 Misc 2d 798, *supra*), the landlord's notice expressly provided for the automatic termination of the leasehold at the end of the cure period (see *Apparel Center Bldg. Corp. v Super Parking Corp.,* NYLJ, Dec. 7, 1979, p 5, col 2).

Accordingly, the judgment appealed from should be modified by deleting decretal paragraphs one, two, three, four, six and seven, and substituting a provision declaring that paragraph 11 of the ground lease has been violated by the agreements of May 2, 1980 and January 1, 1981, and that the tenancy interests may cure the violation within the time remaining in the cure period computed from the time

they obtained the temporary restraining order. As so modified, the judgment should be affirmed.

NIEHOFF, J. (concurring). In my judgment, Special Term did not err, on the law or on the facts, when it held that "[b]y its terms, the May agreement clearly indicated that the parties intended that an assignment of the lease of each of the six theatres be obtained"; "that the parties did not intend that the May agreement itself constituted such an assignment"; and that "[b]ased on the credible evidence presented at the trial and the law regarding construction of forfeiture * * * there was no assignment of the sublease". Hence, I am unable to agree with so much of the majority opinion as holds that the May, 1980 agreement "constituted an assignment of Mann's sublease".

However that may be, it is abundantly clear from the record that both the May, 1980 agreement and the successor January, 1981 agreement put Mann in violation of so much of paragraph 11 of the lease as provided that the tenant "shall not * * * permit any part of the demised premises to be used by others, whether voluntarily or * * * otherwise, without the prior written consent of Landlord in each instance". This restriction is extremely broad in scope and takes in agreements, irrespective of the name bestowed on them by the parties, such as the two agreements between Mann and Brighton giving Brighton unfettered use of the premises, which are not forbidden by the assignment and sublease language of paragraph 11.

The notice sent to Mann which declared Mann in default gave Mann a cure period not provided for in the lease. While it may be argued that a strict technical reading of the notice limits its effectiveness to an assignment or subletting of the premises, on balance I am of the view that the notice adequately apprised Mann of the fact that the landlord knew that a new entity was in possession of the theatres, although the landlord was unaware of the legal basis for the occupancy, and informed Mann that the condition to be cured was the elimination of the operation of the theatres by an independent entity. Therefore, although I do not agree that there was an assignment, I concur with the majority in holding that the judgment appealed from should be modified and that there should be

a declaration that the ground lease has been violated. I also agree with the majority that time to cure the violation still remains.

MOLLEN, P. J., and MANGANO, J., concur with LAZER, J.; NIEHOFF, J., concurs in the result, in a separate opinion.

Judgment of the Supreme Court, Nassau County, entered August 19, 1981, modified, on the law, by deleting all but the fifth decretal paragraph and substituting therefor a provision declaring that paragraph 11 of the ground lease has been violated by the agreements of May 2, 1980 and January 1, 1981, and that the tenancy interests may cure the violation within the time remaining in the cure period computed from the time they obtained the temporary restraining order. As so modified, judgment affirmed, without costs or disbursements. The time within which the appellant may cure the violation will commence to run upon service on it of a copy of the order to be made hereon, with notice of entry.