**VISTA VILLAGE MOBILE HOME PARK, James K. Thompson, and D.W. Holdsworth, Petitioners,**

v.

**Jess BASNETT, as Personal Representative of the Estate of Henry C. Monroe, and Shirley A. Monroe, Respondents.**

**No. 84SC411.**

Supreme Court of Colorado,
En Banc.

Jan. 20, 1987.

Haddon, Morgan & Foreman, P.C., Norman R. Mueller, Denver, for petitioners.

Norman Aaronson, Legal Aid & Defender Program, Boulder, Starrett and Doyle, Robert A. Starrett, Stephen P. Doyle, Denver, Julee Wilets, Englewood, for respondents.

ROVIRA, Justice.

We granted certiorari to review the adoption by the court of appeals of section 15.2(2) of the *Restatement (Second) of Property* in *Basnett v. Vista Village Mobile Home Park,* 699 P.2d 1343 (Colo.App. 1984). Section 15.2(2) prohibits a landlord from unreasonably refusing consent to alienation by a tenant unless a freely negotiated provision in the lease allows such unreasonable refusal. However, because we conclude that the record does not support the finding on which the ruling was based, we reverse the judgment of the court of appeals without reaching the propriety of adopting section 15.2(2).

### I.

Carl Monroe (tenant) and his wife purchased a vacant mobile home from John Pollock, a mobile home broker, in August 1979. The home was situated on lot 77 of the Vista Village Mobile Home Park (the park). Tenant moved into the park on September 1, 1979, after signing a month-to-month lease for rental of lot 77.

In February of 1980, tenant tendered the monthly rent to Fran Thompson, the assistant manager, and told her that he was moving out and selling his home. Mrs. Thompson told him that, because the owners wanted the older homes out of the park, he would not be able to sell his home "on site"; that is, the new buyer would not be allowed to continue to lease lot 77 from the park. This meant that if tenant sold the home, it would have to be moved out of the park.[1]

Tenant then checked with Mr. Thompson, the park manager, and was told the same thing. Tenant was then given a notice by Mr. Thompson, dated April of the previous year, listing the criteria the park used in determining when on-site sales would be permitted. Tenant wrote on the top of the notice "Given to me 2/27/80." Tenant then spoke with David Holdsworth, a general partner of the partnership that owned the park, and was again told he would not be allowed an on-site sale. Tenant had previously arranged to sell the home back to Pollock, the mobile home broker, but this was not communicated to the park.

The notice stating when on-site sales would be allowed was developed in reliance on paragraph seven of the lease, which provides:

> bly less than homes whose new owners can continue to lease the space the home is on before sale.

---

1. Because of the high cost of moving a mobile home, in relation to its purchase cost, homes that cannot be sold on site are worth considera-

RENTAL HOMES NOT PERMITTED: Lessee agrees not to lease, sublet or assign any part of said premises nor of his mobile home located thereon without advance written consent of Lessor and not to allow any other persons to occupy said premises hereby rented except in the case of casual visits of friends or guests. Lessee agrees that if he should sell a mobile home located on the leased premises, the sales agreement will provide for a delivery of the mobile home to the buyer at a place other than the leased premises; PROVIDED, HOWEVER, that no such provision is necessary if prior to such delivery the prospective buyer has submitted to Lessor a signed lease and Lessor has accepted and executed said lease.

How carefully the lease was explained to tenant was disputed. Tenant[2] and his wife later testified that Mr. Thompson, the park manager, just skimmed the lease, and never mentioned paragraph seven at all. Mr. Thompson testified that he went over all the provisions, including paragraph seven.

In June, tenant filed suit against the park, Mr. Thompson, and Holdsworth, claiming fraud, intentional concealment, negligent misrepresentation, and unreasonable restraint on alienation of property. The complaint alleged that the park had either intentionally or recklessly failed to point out the significance of paragraph seven to him. It also stated that had he known that he would not be allowed to resell on site, he never would have purchased the home. Further, it alleged that the prohibition against on-site sales was an unreasonable restraint on alienation of property and unconscionable. He requested compensatory and exemplary damages.

Tenant ceased paying rent in July. In response, the park filed a Forcible Entry and Detainer action in August. The cases were consolidated and a hearing on the F.E.D. action was held on September 8, 1980.

At that hearing, the court heard testimony that the park's usual practice was to allow on-site sales as a "reward" to good tenants. If a tenant had not earned such reward, the park would not allow an on-site sale. The court also heard testimony that the park was concerned about tenant's attitude because he had been outspoken against a rent increase.

The trial court held that the lease required the park "not to unreasonably withhold [its] consent to a lessee who desires to sell a mobile home. In this case, however, the lessee did not come to the lessor with a prospective buyer...." The court held further, though, that since the park had made it "unequivocally clear" that tenant would not be allowed to sell his mobile home on site no matter who the buyer was, tenant's failure to communicate the existence and identity of the prospective buyer to the park for its approval did not relieve the park of the duty to act reasonably. Therefore, the tenant was not in breach and owed no rent.

At the end of the hearing, the following colloquy occurred:

MR. ADLER: (tenant's counsel) As I understand it, sir, there is no present rent obligation and if I understand the Court's ruling?

THE COURT: There is no present rent obligation until the [park] considers a *prospective tenant* and reasonable (sic) and that is a very broad term, rejects a prospective purchaser or other circumstances which may arise then clearly your client owes the rent, yes.

MR. LETOFSKY: (the park's counsel) I am thinking if there is some duty on the part of the tenant to try to sell the premises, try to obtain a prospective *tenant-buyer*, otherwise he could conceivably keep it there indefinitely without any effort?

THE COURT: Absolutely not, if he doesn't have a buyer, if he doesn't—let me amplify on the order slightly. I am

---

**2.** By the time of the trial in April of 1982, tenant had died. His deposition, which had been taken during discovery, was read into the record. A personal representative represented him at the trial.

going to assume that [tenant] has a buyer and that the *lease from the prospective buyer* will be tendered to the [park] no later than five days from this date, otherwise, Mr. Adler, I have given you carte blanche and I agree with you, Mr. Letofsky.

MR. ADLER: I can understand. (Emphasis added).

Within the five-day period, the only buyer presented by tenant was Pollock, the mobile home broker. Pollock refused to sign a lease with the park because he had no intention of being a tenant, and only wanted the home for resale. The park therefore would not allow an on-site sale to him.

The trial on the fraud and related claims began on April 20, 1982. Tenant produced evidence that the importance of paragraph seven had been intentionally hidden from him, and that he would not have bought the home had he known he would not be allowed to resell on site.

The park attempted to show that its reason for not allowing the on-site sale in February of 1980 (the original attempted sale, before the F.E.D. hearing) was concern over the structural integrity of the home, which was an older one, built before a safety code for mobile homes had been adopted. Therefore, the park argued, its refusal to allow the sale was reasonable.

The park's evidence that safety was its motivation not to allow the sale to Pollock was impeached by use of Mr. Thompson's testimony from the F.E.D. hearing, when he stated that the home was structurally sound.

At the conclusion of the trial, the court found that the park refused to allow an on-site sale to Pollock, both in February of 1980 and after the F.E.D. hearing, solely because of animosity toward tenant and for no other reason. The court awarded actual

damages of $290 for breach of the lease after the date of the F.E.D. order. The park was also held liable for fraudulent concealment for its actions prior to the F.E.D. hearing; compensatory and punitive damages were awarded.

The court of appeals affirmed. In upholding the trial court's ruling on the breach of lease claim, the court of appeals adopted and applied the following standard:

A restraint on alienation without the consent of the landlord of the tenant's interest in the leased property is valid, but the landlord's consent to an alienation by the tenant cannot be withheld unreasonably, unless a freely negotiated provision in the lease gives the landlord an absolute right to withhold consent.

*Restatement (Second) of Property* § 15.2(2) (1977).[3]

The court of appeals noted that the lease had no explicit authorization for the park to withhold consent arbitrarily and unreasonably. It therefore affirmed the trial court's ruling that failure to consent to an on-site sale to Pollock during the five-day period after the F.E.D. hearing violated the lease.

We granted certiorari to review the propriety of the court of appeals' adoption of section 15.2(2) of the *Restatement (Second) of Property*. However, because we find no evidence in the record to support the trial court's finding that the park's refusal to allow an on-site sale to Pollock after the F.E.D. hearing violated the lease, we reverse without reaching the section 15.2(2) issue.

II.

The trial court's construction of the lease at the F.E.D. hearing was that the park had unreasonably refused to consent to the on-site sale by tenant. Therefore, no rent was due "until the [park] considers a prospective tenant...." The park then in-

---

**3.** The comments to this section indicate that when a court is determining whether a restraint on alienation is reasonable it should consider the type and length of the lease. *Restatement (Second) of Property* § 15.2 comment g (1977). The shorter the lease, the less the need to justify a refusal to consent to alienation—the provision should never be applied to enforce an attempted alienation of a tenancy at will. *Id.* Similarly, a court determining whether a purported reason is reasonable should recognize that a reason that might be satisfactory in the context of a residential lease might not be so in a commercial lease, and vice-versa. *Id.*

quired if tenant had a duty to obtain "a prospective tenant-buyer," and, in response, the court ordered the tenant to present a "lease from the prospective buyer" within five days.

Both Mr. Thompson and Pollock testified that when Pollock offered to buy the home during the five-day period, he was asked to enter into a lease, and he refused. Mr. Thompson then refused to approve the on-site sale. Mr. Thompson also testified that, had Pollock entered into a lease applying for tenancy, he would have considered it just as he considered all other lease applications, taking the court's interpretation of paragraph seven (that the park could not refuse consent to an on-site sale unreasonably) into account.

Despite this uncontradicted testimony, the trial court found the park's refusal to consent to the on-site sale was "solely" due to animosity toward tenant. Based on this finding, the court held the park in breach for its refusal to allow an on-site sale to Pollock after the F.E.D. hearing.

While there is evidence to support a finding of animosity between the park and tenant prior to the court's F.E.D. order, there is no evidence in the record to show animosity after the court's order. Both Pollock and Thompson testified that the on-site sale to Pollock was not refused until *after* Pollock failed to tender a signed lease. The park was simply holding tenant to the trial court's order that tenant find a tenant-buyer who was willing to sign a lease.

Thus, there is no evidence to support the finding that the sole reason for the refusal

to allow on-site sale to Pollock was due to animosity toward tenant. A factual finding that has no support in the record cannot serve as the basis for a judgment. C.R.C.P. 52(a); *Briano v. Rubio*, 141 Colo. 264, 347 P.2d 497 (1959) (where no competent evidence to support trial court's factual finding, judgment based thereon reversed on appeal). The park cannot be in breach for simply holding the tenant to the terms of the trial court's order.

Since tenant never produced another tenant-buyer, we do not reach the issue of whether the park could have unreasonably refused an on-site sale to such a prospective tenant-buyer, had one been forthcoming.[4]

The judgment of the court of appeals is reversed as to the breach of lease claim.

---

**4.** Some states have adopted the *Restatement (Second)* position only for either residential leases or commercial leases, but not both. For example, California has adopted the position only in the context of commercial leases. *Kendall v. Ernest Pestana, Inc.,* 40 Cal.3d 488, 220 Cal.Rptr. 818, 820, n. 1, 709 P.2d 837, 839 n. 1 (1985). Other states have adopted it only in the context of residential leases. *E.g.,* N.Y. Real Prop. § 226–b (McKinney 1982) (the New York Appellate Division later refused to extend this adoption to commercial leases in *Mann Theaters Corp. v. Mid-Island Shopping Plaza Company,* 94 A.D.2d 466, 464 N.Y.S.2d 793 (1983)). Still others, Oregon, for example, have adopted the posi-

tion only in the context of mobile home parks. *Or.Rev.Stat.* § 91.890 (1986).

Since different states apply the provision in different (and sometimes mutually exclusive) circumstances, it is clear that the *Restatement (Second)* position can be seen as serving different policy goals. As such, some jurists have stated that the decision whether or not to adopt it may better be made by a legislature. *See, e.g., Kendall,* 40 Cal.3d 488, 220 Cal.Rptr. 818, 833, 709 P.2d 837, 852 (Lucas, J., dissenting) (suggesting that "if California is to adopt the [*Restatement* position], it do so by clear legislative action."); *Mann Theaters,* 94 A.D.2d 466, 464 N.Y.S.2d 793 (1983) (by implication).