[905 NYS2d 501]

ANGELO JOHNS, Petitioner, v AMC BEAUTY SALON et al., Respondents.

Civil Court of the City of New York, New York County, July 27, 2010

### APPEARANCES OF COUNSEL

*Goldberg, Scudieri, Lindenberg & Block, P.C.,* New York City (*Paul S. Block* of counsel), for petitioner. *Judith M. Brener,* New York City (*Blair Hofherr* of counsel), for Sol Goldman Investments, LLC, respondent.

## OPINION OF THE COURT

ARLENE P. BLUTH, J.

On June 2, 2010, respondent AMC Beauty Salon surrendered possession of the entire premises it leased back to its landlord, corespondent Sol Goldman Investments, LLC. In the writing accompanying the return of the keys, AMC made the specific representation that "[t]here are no occupants in the premises as of today." Petitioner here claims that he subleased part of that premises from AMC for his office space as a psychic, that he was on vacation on June 2, 2010 and when he returned he discovered that the premises was locked up and a "for rent" sign was posted. Petitioner sues here to be restored to possession of part of the commercial premises at 465 Lexington Avenue, New York, New York. AMC defaulted and Sol Goldman Investments opposed.

At the hearing, both appearing parties were represented by counsel. Angelo Johns testified on his own behalf and Natasha Singh testified on Sol Goldman Investments' behalf (although named as Zvestrant in the caption, the true over-landlord was Sol Goldman Investments, LLC).

At the conclusion of the hearing, petitioner's counsel sought time to submit a memorandum of law. Time was granted and the stay was continued, but no memorandum was submitted.

Based upon the evidence introduced at the hearing and having had the opportunity to observe the demeanor of the witnesses and assess the credibility of their testimony, this court finds the following:

Findings of Fact

In or about August 2006, Sol Goldman Investments, LLC (SGI or over-landlord) entered into a lease with AMC Beauty Salon for the basement, ground floor and second floor at 465 Lexington Avenue in Manhattan. AMC operated a salon/spa therein, where massages, manicures, pedicures and other services were provided. On or about January 1, 2010, without the knowledge or consent of SGI, AMC sublet the front part of the second floor to Angelo Johns for use as a "psychic." The sublease (exhibit 1) provides for rent at the rate of $4,500 per month; it is a Blumberg plain language form lease with the blanks filled in by handwriting (as opposed to being typed). Paragraph 8 of the form sublease provides: "This Sublease is subject to the Over-Lease. It is also subject to any agreement to which the Over-Lease is subject. You, the Undertenant, state

that you have read and initialed the Over-lease and will not violate it in any way."

AMC got into some trouble with the authorities (for allegedly operating an illegal "bottle club" in the premises) and surrendered the premises to SGI on June 2, 2010. The surrender (exhibit A) is signed by Alan Chan, president of AMC, and gives back the entire space to SGI with the specific representation that "[t]here are no occupants in the premises as of today." Natasha Singh, the SGI employee who was responsible for collecting the rent for that building, testified credibly that she knew Mr. Chan (as he was often in arrears and thus no stranger to the rent collector), that she saw Mr. Chan sign the surrender agreement, and that she did a walk-through of the premises and saw no indication that a sublet had occurred or that a psychic had opened in the premises. Rather, Ms. Singh testified that AMC was in rent arrears on the date of surrender and that the only items she saw in the premises on that day were salon-related, such as massage tables, televisions, etc. Ms. Singh credibly testified that if there was a psychic operating in the premises, she had no knowledge of it and she saw no sign of it.

Ms. Singh's testimony made sense in light of Mr. Johns's testimony that the over-landlord never gave its required approval of the sublease, that he never paid rent to the over-landlord, and that he never spoke to anyone in the over-landlord's office about anything—not about problems in the premises or about getting approval for the sublease nor for renovations he claimed he did. Although Mr. Johns claimed that he spoke to a worker in the building, and tipped him occasionally to keep the floor clean, Mr. Johns never claimed that he spoke to anyone in the SGI office at any time about anything. Nor did he produce or subpoena the on-site SGI worker he claims knew that he was operating in the premises as a psychic.

Mr. Johns did testify, however, that he paid his subrent in cash every month to AMC and he showed handwritten receipts therefor (exhibit 2). He could not explain, however, why his receipts showed $4,900 but his rent in the sublease was $4,500; when asked, Mr. Johns shrugged and suggested that maybe it was electric charges, although he did not produce or claim that he ever received an electric bill and no mention of additional fees for electric was in the sublease.

Other parts of Mr. Johns's testimony did not appear credible, either. Although he claimed the over-landlord knew he was there because of an illuminated sign, he produced no proof thereof.

He also claimed that the over-landlord would have known of his presence because of the foot traffic to his business, but when asked how many customers he saw a day, his response was "sometimes 3 or 4, sometimes none." Mr. Johns also produced as witnesses two women who worked in the salon before it gave up the space to the landlord, but they did not support his claim of being a continued daily presence. Cici Yu said she worked on the second floor and basement and saw Mr. Johns a total of only "3-4 times" and Jenny Chen said she only saw him twice. Furthermore, although it was commercial space, Mr. Johns oddly testified that his wife and children would be hurt if he could not return because he re-did the whole "apartment"— that he put in a new kitchen, dropped ceilings and a new floor. He did not claim to live there, however.

From the totality of the evidence, while this court believes that Mr. Johns may have had an unapproved sublease with AMC, he did not work regularly during the day from those premises. The two women who did work during the day saw him a combined number of six times in the entire five months he claimed to have been there; that fails to prove a regular daily presence, and in fact indicates that Mr. Johns was rarely there during the day. Therefore, if Mr. Johns was there for five months, then he worked primarily at night, when he could turn on an *illuminated* sign, when the salon employees would not see him, and, more importantly, when the over-landlord and its on-site employees would not see him either. Moreover, if he worked at night, then he worked when the alleged illegal bottle club was operating.

Petitioner admitted that he never made himself known to the over-landlord and never obtained the required approval of the sublease. The court notes that petitioner did not even know the over-landlord's name: petitioner created the caption of this case from his alleged sublease, and the handwriting naming the over-landlord on that sublease does indeed look like "Sol Goldman Zvestrant."

Based upon the evidence and credibility findings, this court determines that petitioner tried to and did avoid detection by the over-landlord and, contrary to his testimony, did not make his occupancy known to any of the landlord's employees who worked at the building site. Further, the court credits Ms. Singh's testimony that when AMC voluntarily surrendered possession, it was in violation of its lease due to nonpayment and faced trouble with the authorities for operating an illegal bottle

club (or allowing an illegal bottle club to be operated in the premises). The court also finds Ms. Singh credible that when she did a walk-through of the premises, she saw no indication that a psychic operated out of the premises or that a portion of the premises was sublet to anyone. Even viewing the evidence in the light most favorable to the petitioner, the court finds that AMC was in default of its payment obligations when it voluntarily surrendered the entire space to SGI with the representation that no one else was in occupancy or had occupancy rights, that SGI had no idea that AMC had sublet a portion of the space, and, even after doing a walk-through upon vacatur, nothing visible at the premises indicated to SGI that anyone other than AMC occupied the space. Finally, this court finds that SGI had no reason to have any knowledge of the subtenancy because it was purposely hidden from it.

Conclusions of Law

Under the "voluntary surrender doctrine" a nondefaulting prime tenant's voluntary surrender of the main lease to the landlord transforms the subtenant into the landlord's direct tenant (*Eten v Luyster*, 60 NY 252, 259 [1875]; *Duane Reade v I.G. Second Generation Partners*, 280 AD2d 410, 411 [1st Dept 2001]). This doctrine makes sense; without it, the landlord and prime tenant can collude to deprive an innocent subtenant from the benefit of his bargain. In the cases applying this doctrine, however, the landlord has known about the subtenant and consented, either expressly or by a course of conduct, to the sublease. Such is not the case here, as SGI never consented to the sublease, never knew that a sublease was executed, and never even knew anyone but AMC was in the premises operating a salon/spa.

A tenant cannot give what it does not have, and an over-tenant can give no greater rights to its subtenant than that which the over-tenant obtained in its prime lease. (*Mann Theatres Corp. of Cal. v Mid-Island Shopping Plaza Co.*, 94 AD2d 466, 471 [1983], *affd* 62 NY2d 930 [1984].) Here, the over-tenant, AMC, only had the authority to sublet with the consent of SGI, its landlord. Therefore, the sublease is unenforceable without the consent of the over-landlord, SGI. (*See Millicom Inc. v Breed, Abbott & Morgan*, 160 AD2d 496, 497 [1st Dept 1990].)

There are benefits to not hiding your occupancy. If you get the over-landlord's consent to a sublease, then the over-landlord has actual notice of your occupancy. Then you would have to be

named and served in any eviction proceedings against the over-tenant, and if the over-tenant voluntarily gave back the space without being in default, then you would become the direct tenant of the over-landlord.

Here, by failing to get SGI's approval, and by purposely avoiding detection by SGI, the petitioner/subtenant took a calculated risk: if the over-landlord were to evict the over-tenant, the subtenant would not be named in the proceeding (other than as a "Doe" respondent) and if the over-tenant voluntarily surrendered the space, the petitioner would have no right to stay.

SGI did not evict Mr. Johns. If Mr. Johns claims he was wronged due to an illegal eviction, his claims should be directed to AMC, the entity which, while in default in its lease with SGI, surrendered possession to SGI and affirmatively represented to SGI that there were no other occupants.

The time for Mr. Johns to announce his presence was in a request for a consent to sublease before he took occupancy or even during the five months that he claimed he was in the premises. To shout "Surprise! I'm here!" after AMC surrendered the premises is too little and too late. Petitioner Angelo Johns, having decided to surreptitiously sublet part of the premises, cannot now complain that SGI did anything improper by accepting the surrender, free and clear of all occupants, from AMC, the only entity it knew to be on the premises. To rule otherwise would reward an illegal subtenant for staying under the landlord's radar and give rights where none ever existed.

Accordingly, the petition is dismissed. Judgment for respondent Sol Goldman Investments, LLC; all stays are vacated.