Edward J. Greenfield, J.
This action, by a tenant in an office building for a declaratory judgment and an injunction to compel the landlord to give its consent to a proposed sublease, raises interesting questions as to the factors to be considered in determining whether withholding of consent to subletting is unreasonable.
Plaintiff American Book Company is the occupant of three floors and part of the basement space in an office building at 55 Fifth Avenue, in the City of New York. It occupies the premises under written leases entered into with 55 Associates, a limited partnership which then owned the building, running from October 1, 1961 to December 31, 1975. Pursuant to the terms of that lease the demised premises were to be used for executive and general offices, and for stockroom and storage. The lease was the standard Real Estate Board form, which provided: “ Tenant * * * shall not assign, mortgage or *32 encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others, without the written consent of the Landlord in each instance.”
A typewritten rider to the lease provides: ‘ ‘ Wherever in this agreement the Tenant is required to secure the consent of the Landlord, such consent shall not be unreasonably withheld. ’ ’
During 1968 Litton Industries, Inc., plaintiff’s parent company and the owner of all its stock decided to consolidate plaintiff’s operations with two other book publishing companies it owned. Inquiry revealed that there was no additional available space at 5'5 Fifth Avenue. Thereupon plaintiff took steps to vacate its space, and sublet it to someone alse. In 'September, 1968 plaintiff notified the managing agent of the building that it proposed to sublet all its space to Planned Parenthood-World Population, and requested the landlord’s written consent.
'Since the inception of the lease, the ownership of the building had changed hands, from 55 Associates to Franchard Corporation, and then in 1965 to defendant Yeshiva University Development Foundation, Inc. On November 7, 1968, two months after the request for consent to sublet had been made, plaintiff was notified that consent would not be forthcoming. The letter stated: “ Please be informed that the landlord cannot consent to such subletting and considers the activities of the proposed subtenant to be inconsistent with the present use of the premises and with the educational activities of the University. ’ ’
American Book Company and Planned Parenthood Federation of America, Inc. had formalized the proposed sublease on October 17, 1968, commencing March 1, 1969 and running for the balance of the term. It was contingent however upon finally obtaining the approval of the landlord by February 15, 1969.
Plaintiff brought this action, alleging irreparable damage would result if it could not go through with the proposed sublease, and asks for an injunction requiring defendant specifically to perform its agreement not to withhold consent unreasonably, and for a declaratory judgment adjudging that defendant is obliged to consent to the sublease between plaintiff and Planned Parenthood.
As a threshold defense, defendant asserts it is not a proper party to this proceeding, inasmuch as it, as owner, had entered into a long-term lease of the entire building to Yeshiva University, a separate corporate entity, running to the year 2061, under the terms of which the university, and not the foundation, had the power to consent to any proposed subleasing. This defense is untenable. The foundation is the owner of record, it is the foundation to whom all rents .are directed to be paid, *33 and the plaintiff was never a party to any private agreements made by its landlord unbeknownst to it.
We come then to the question of whether a landlord, as the asserted grounds for refusing consent to a proposed sublease, may point to alleged philosophical and ideological “inconsistencies ” between itself and the proposed subtenant, or to the “ controversial” nature of the subtenant. Neither party has offered any cases directly in point.
The general rule is that in the absence of an express restriction by contract or statute, a tenant has an unrestricted right to assign or sublet as he wills. (Fleisch v. Schnaier, 119 App. Div. 815; Syracuse Sav. Bank v. D’Elia, 185 Misc. 928; Werber v. Weinstein, 207 Misc. 707.) Provisions restricting assignment or subletting are restraints which are not viewed with favor by the courts. (Francis v. Ferguson, 246 N. Y. 516; Presby v. Benjamin, 169 N. Y. 377; Riggs v. Pursell, 66 N. Y. 193.)
If, however, the lease contains an express covenant restricting assignment or subletting without the landlord’s consent, the ■ landlord may arbitrarily refuse his consent for any reason, or indeed for no reason. (Ogden v. Riverview Holding Corp., 134 Misc. 149, affd. 226 App. Div. 882; Arlu Assoc, v. Rosner, 14 A D 2d 272; Dress Shirt Sales v. Hotel Martinique Assoc., 16 A D 2d 899, affd. 12 N Y 2d 339.) That absolute right to withhold consent contained in the standard Beal Estate Board printed form lease was here modified by the inclusion of the not uncommon rider that the landlord’s consent was not to be ‘ ‘ unreasonably withheld ’ ’.
The standards of ‘ ‘ reasonableness ’ ’ have not heretofore been clearly delineated by any single New York case, but are left to the trial court to determine in accordance with the particular factual patterns before it, and the conceptual boundaries may be only faintly discerned in the few reported cases.
It would appear to me, after such a review, that the purported reasons for refusal of consent by a landlord fall into two broad categories — ■ objective and subjective. By “objective ” are meant those standards which are readily measurable criteria of a proposed subtenant’s or assignee’s acceptability, from the point of view of any landlord:
(a) financial responsibility
(b) the “ identity ” or “ business character ” of the subtenant —i.e. his suitability for the particular building
(c) the legality of the proposed use
(d) the nature of the occupancy — i.e. office, factory, clinic, or whatever.
*34 Most of these categories form a ready basis upon which to predicate a ‘ ‘ reasonable ’ ’ refusal, and need no further elucidation. Thus, in 57th Street Luce Corp. v. General Motors Corp. (182 Misc. 164, affd. 267 App. Div. 978, affd. 293 N. Y. 717) where the lease provided the premises were to ibe used for an automobile showroom, warehouse, garage or allied business, and they were sublet for the manufacturing and printing of paper cartons, it was held there was a proper sublease because, “in the absence of restrictions contained in a'lease a tenant may utilize the demised premises in any lawful manner not materially different from that to which it is adopted and for which it was constructed.” (p. 168). (See, also, Lyon v. Bethlehem Eng. Corp., 253 N. Y. 111; Bovin v. Galitska, 250 N. Y. 228.)
In Time Inc. v. Tager (46 Misc 2d 658) on the other hand, it was pointed out that factors other than financial responsibility, respectability and the character of the business could properly be taken into account. In that case it was the use of the space (subdivision into multiple subtenancies) which gave the landlord the basis for a reasonable withholding of consent.
In this case, however, there is nothing inherent in the identity of the proposed subtenant which would render it manifestly objectionable by any of the objective standards mentioned above. It is financially responsible, engaged in a respectable and legal activity, and intends to use the entire space of the prime tenant for identical purposes — -as executive offices and a stockroom for its publications. If it is objectionable, it is because of the identity of the landlord, who urges that immiscible doctrinal differences render peaceful coexistence in the same building impossible, or at least uncomfortable.
If the original landlord here, 55 Associates, or its successor, the Franchard Corporation, both profit-making commercial enterprises, had continued ownership of the ¡building there could have been no real question as to the acceptability of the proposed subtenant. The objection arises, therefore, because of who the landlord is, not who the tenant is. Can the reasonableness or unreásonableness of refusing consent vary with the identity and activities of the landlord? If so, we are relegated not to the objective standards by which any tenant may be measured, but to wholly subjective criteria which render effective judicial review difficult, if not impossible.
To the extent that rejection of a proposed subtenancy is based upon the supposed needs or dislikes of the landlord, a policy of judicial disapproval of such subjective criteria is discernible. For example, in Matter of Cedarhurst Park Apts. v. Milgrim *35 (55 Misc 2d 118) the corporate landlord’s refusal to approve a sublet of an apartment to an otherwise acceptable lessee because it wanted the apartment for one of its corporate officers was held unreasonable.
And where an assignment of a lease to one who desired to operate a tavern was not consented to because of the landlord’s personal objections to that type of business, even though there was no restriction on the nature of the business in the paramount lease, the Supreme Court of the State of Washington held that the personal objections of the landlord to the business conducted ¡by the subtenant could not form the basis for the reasonable withholding of consent. (Roundup Tavern v. Pardini, 68 Wn. 2d 513.)
As stated in Broad & Branford Place Corp. v. Hockenjos Co. (132 N. J. L. 229, 232) where a landlord objected to a tenant who was going to use the premises as a poultry dressing establishment, and where there were no restrictions of any kind in the lease: “Arbitrary considerations of personal taste, sensibility, or convenience dó not constitute the criteria of the landlord’s duty under an agreement such as this. Personal satisfaction is not the sole determining factor.”
If the landlord’s own needs and his own crotchets and predilections are not to be taken into account, can greater weight be given either to his prejudices, his differences of philosophical, theological or social doctrine, or to his fear of “controversy”? I think not. Some indications of expressed public policy in this regard can be gleaned-from the restrictions on the landlord’s freedom to rent to whom he pleases by section 259-b of the Real Property Law. (L. 1962, ch. 646.) That section, by prohibiting restraints on the “ assignment, conveyance, ownership, lease, rental, use or occupancy of real property to or by any person because of race, creed, color, national origin, or ancestry ’ ’ which are ‘1 declared to be void as against public policy” rules out criteria not only of purely subjective dislikes, but also of doctrinal differences, for “ creed ”, broadly speaking, refers to a body of religious, philosophical, scientific or political opinions and beliefs. Surely a professed difference as to the tenets of the Old Testament being at variance with medical and sociological views held by others, if not literally comprehended within the spirit of section 259-b of the Real Property Law, is the sort of credal conflict which should not be imported into questions of commercial tenancy. If an Orthodox Jew can reject a tenant who does not subscribe to his view of the Talmud, why can the devout 'Catholic not reject the Jewish tenant, and the ardent Republican refuse space to a Democrat? *36 Doctrinal anathema cannot be the predicate of any rational law of landlord and tenant in an era of urban complexity an'd philosophic diversity.
True it is that juxtaposition may give rise to embarrassment. That is why section 259-b of the Real Property Law recognizes an exception to the rule of nondiscrimination. Differences of creed may be taken into account when the property is owned by a religious institution and is used “ for religious purposes ”. With this exception there can be no quarrel. But the building involved in this case is not a religious edifice — it is a commer- t dal office building, some floors of which are used by an educational institution with religious affiliation, for pedagogic, administrative and fund-raising activities and the rest by a diverse group of profit-making businesses and nonprofit foundations. And the landlord is not a religious institution — it is a foundation holding title to real estate for the benefit of the university, whose charter describes its activities as “ exclusively for educational purposes ”, with “ persons of every religious denomination * * * equally eligible to offices and appointments.”
I therefore hold that when a religious or religiously affiliated or educational institution operates a commercial enterprise or owns commercial property, it is to be held to the established standards of commercial responsibility, its acts and conduct ■being vested with no greater and no lesser sanctity than those of any other owner.
If this be so, then the contentions of the defendant as to the inappropriateness of Yeshiva University and Planned Parenthood occupying space in the same commercial office building are of little moment. Indeed, the argument that there is a fundamental conflict in the outlook of these two groups with respect to the need and practice of birth control is a matter of theological disputation in which courts should not be immersed. ‘ ‘ Be fruitful, and multiply” commands the Bible, (Genesis, I, 28.) But the Talmud recognizes the propriety of birth control by females to preserve life and health. ('See Guttmacher, ‘ ‘ Traditional Judaism and Birth Control ”, 16 Judaism, No. 2, pp. 159-165 [1967].) Defendant’s own witness, Dr. Alvin I. 'Schiff conceded that less than 10% of the Jewish population would find the activities of Planned Parenthood anathema to them, but felt the potential controversy that might be engendered even with this small but intensely devout group was ample justification for refusing consent to the sublease. If indeed the potentiality for controversy were a serviceable standard for measuring the acceptability of a subtenancy, many of our most socially useful institutions would be homeless vagrants on the streets, and *37 our buildings would be tenanted by bland, unexceptionable models of propriety and dullness. Even proponents of unpopular ideas are entitled to a roof over their heads. Landlords are not censors — their dominion is over realty, not ideas. Their ownership of property does not confer upon them the right to reject subtenants merely because their ideas differ from their own.
The contradictions in the defendant’s position are highlighted by the undisputed testimony that the Albert Einstein College of Medicine, one of the most prestigious components of Yeshiva University gives a course on birth control, that it sponsors four birth control clinics, and that its head of the department of gynecology and obstetrics also serves as chairman of the medical committee of Planned Parenthood. When asked if this was a source of embarrassment to the university administration, the answer forthcoming was, “ Well, they’re in the Bronx ”. In other words, since Planned Parenthood would be listed on the building directory, defendant is more fearful of being tarred with the brush of association by proximity than with association by actual affiliation! I find its fears that somehow the occupancy of space in its building by the executive offices of Planned Parenthood (not for a clinic or for public meetings, mind you) would inhibit the university’s fund-raising activities are entirely without foundation. Equally baseless are the later-asserted claims of potential inconvenience and congestion, since the staff and the anticipated daily traffic of the subtenant are in fact smaller than those of the current tenant.
One last observation as to the respective rights of this tenant and this landlord. When plaintiff entered into its lease originally, it had the right to assign the lease or sublet its premises to anyone who was financially, morally and legally acceptable by objective standards, and who would use the space in accordance with the provisions of the lease. Was that a fixed contractual right or was it somehow circumscribed by the accession of a new landlord? I doubt it. Defendant, as the successor in interest to the prior owners stepped into their shoes, acquiring no greater rights than its predecessors (Matter of 507 Madison Ave. Realty Co. v. Martin, 200 App. Div. 146, affd. 233 N Y 683; Kuntsen v. Cinque, 113 App. Div. 677); and even if landlords were somehow accorded the right to reject subtenants because of presumed antithetical philosophies, plaintiff had a fixed contractual right which I believe could not be varied because of the differing nature and activities of defendant, as successor landlord.
*38 Plaintiff is entitled to the relief it seeks — a declaratory judgment that it may properly sublet to Planned Parenthood, Inc. and that the defendant having unreasonably and arbitrarily withheld consent, is to be directed to specifically perform and approve the proposed sublease.