DREISONSTOK, Executor u/w of Louise S. Dreisonstok and DAVIS, Successor Trustee u/w of Mollie Shepard *v.* DWORMAN BUILDING CORPORATION

[No. 82, September Term, 1971.]

*Decided December 17, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Warren K. Kaplan,* with whom were *Melrod, Redman & Gartlan* and *Hyman Shapiro* on the brief, for appellants.

*Warren Browning* for appellee.

SINGLEY, J., delivered the opinion of the Court.

Mrs. Louise S. Dreisonstok, individually, and as trustee under the Will of Mollie Shepard, on 26 June 1970 brought an action in ejectment in the Circuit Court for Montgomery County against Dworman Building Corporation (the Dworman Corporation) and others, claiming that the defendants had wrongfully retained possession of a parcel of improved land known as 5430 Wisconsin Avenue, Chevy Chase, Maryland.[1] There was evidence that this property consists of four lots, having a total frontage of 200 feet on Wisconsin Avenue, with a depth of 116 feet, improved by a one story brick building containing 2,508 square feet, occupied by Farnsworth Reed, Ltd., a clothing firm, which was a monthly subtenant of one of the defendants.

After a three day trial, the court submitted the case to the jury as to the only remaining defendant, the Dworman Corporation, under an instruction that Mrs. Dreisonstok, as a matter of law, had failed properly to terminate the lease in accordance with its terms.[2] The jury was permitted to decide, however, whether the Dworman Corporation had committed a breach of a lease covenant entitling Mrs. Dreisonstok to re-enter, which would result in a recovery of possession of the premises.

The jury returned a verdict for Mrs. Dreisonstok on the issue of ejectment and for damages in the amount of rents tendered, but not accepted by her.

After receiving the jury's verdict the court considered a plea *puis darrein continuance,* made by the Dworman Corporation on equitable grounds, and concluding that the jury verdict would effect the forfeiture of a leasehold which an expert witness had testified was worth some $561,000 for a failure to make timely payment of taxes

1. The action was dismissed as to the defendants, Farnsworth Reed, Ltd. and State National Bank, and a directed verdict was entered by the court in favor of the defendant, Dworman Development Corporation.
2. We should not be understood as passing on this conclusion, since consideration of it is not necessary to the result we reach.

of $11,667.69, entered judgment for the Dworman Corporation in the ejectment case. The court, in granting equitable relief, then entered an order requiring the Dworman Corporation to pay arrearages of rent, to pay the costs in the ejectment case, and to create and to maintain a security deposit from which rents, taxes and other charges due for more than 30 days could be paid in the future.

Both Mrs. Dreisonstok and the Dworman Corporation appealed from this order. We can only assume that the Dworman Corporation has abandoned its appeal, since it filed a brief as appellee, but not as cross-appellant, Maryland Rules 804 b., 831 c., 831 g., although it did challenge the jury verdict in the brief which it filed as appellee. We regard this challenge, even had it been properly presented, as groundless, since reliance on Code (1957, 1969 Repl. Vol.) Art. 75, § 27 is misplaced in a case where a right of re-entry upon default is conferred by a written lease, *Streeter v. Middlemas,* 240 Md. 169, 174, 213 A. 2d 471 (1965).

An understanding of the controversy requires a somewhat tedious litany of facts. By a lease dated 28 December 1956, Mrs. Mollie Shepard, Mrs. Dreisonstok's mother, had leased to Roger Euster the Wisconsin Avenue property for a term of 20 years with renewal options at a rent which at the time of trial was $1,000 monthly, subject to adjustment at five year intervals to reflect changes in the consumer price index. The lease contemplated that commercial zoning would be obtained; the existing improvements demolished, and that a commercial building costing at least $40,000 would be built by the tenant. The lease contained the provisions customarily found in what has come to be called a "net-net" lease. The tenant covenanted, in part, that he would maintain adequate hazard and public liability insurance at his own expense written to protect the tenant as well as the landlord; that he would promptly comply with and carry out, at his own expense, all "governmental or-

ders" imposed upon or required of the landlord or tenant in connection with the premises, and that he would pay the rent and all taxes as they became due and payable. In 1963, Mrs. Shepard died. Under her Will, an undivided half interest in the Wisconsin Avenue property passed to Mrs. Dreisonstok individually, and the other half to Mrs. Dreisonstok as trustee under the Will.

In November, 1965, Euster assigned his leasehold interest to trustees under a deed of trust to secure a borrowing which he had made from a savings and loan association. In 1967, there was a default in Euster's payments under the obligation secured by the deed of trust, and in December, 1967, the trustees, acting under their power of sale, sold Euster's leasehold interest for $91,000 to Peoples National Bank of Maryland. After protracted negotiations in early 1968, Peoples National Bank sold the Wisconsin Avenue leasehold to Dworman Development Company in April for $125,000.

Dworman Development Corporation is an affiliate of Dworman Building Corporation, and both appear to be parts of a sizeable corporate structure involved in real estate development. Lester J. Dworman is the president and controlling stockholder of both corporations, as well as of the others which comprise the Dworman interests. Mr. Dworman testified that in accordance with his companies' policy the Wisconsin Avenue leasehold was transferred in May, 1969, to Dworman Building Corporation, because substantial improvements were in contemplation at that time.

Mrs. Dreisonstok's attorney, H. Max Ammerman, who acted as her agent, testified that on various occasions in 1968 and early 1969 he had had conversations with Dworman. At the time of Dworman's only visit to his office, Ammerman had informed Dworman of the chronic failure of Euster, the prior tenant, to comply with the covenants of the lease. In particular, Ammerman disclosed Euster's failure to pay the rent and taxes on time, and expressed the hope that Dworman would be more

reliable. Ammerman stated that Dworman "* * * indicated he was a more substantial person; that he * * * had a lot more experience with this sort of thing * * *." Although Dworman testified that he did not remember this conversation, there is a hint of a knowledge of Euster's breaches in Dworman's precautions at the time of settlement. Apprehensive that he was buying "a pig in a poke," Dworman sought, but did not get, an estoppel letter from Mrs. Dreisonstok, stating that there was no default in the performance of the covenants of the lease.

Despite Dworman's assurances, the bill for 1968 taxes due 30 September 1968, remained unpaid for more than six months. During the interim, Ammerman testified that he had had several conversations with Dworman and with his office manager, Mr. Sapanakis, requesting that the taxes be paid. In one such conversation, when he was apprised of the fact by Ammerman that the taxes had not, as yet, been paid, Dworman replied, "Of course not * * * what's the rush?"

On 21 March 1969, Ammerman sent a letter to Dworman, notifying Dworman that he was still receiving delinquent tax bills, and warning him that if the bills were not "taken care of within the next 48 hours, [he] would be compelled to institute such proceedings as [he] deem[ed] necessary to protect the interest[s] of [his] client without delay or further notice to [Dworman]." Despite this warning, the 1968 taxes were not paid until mid-April, 1969.

The bill for 1969 taxes, due 30 September 1969, was forwarded to Dworman on 9 September. With the taxes again overdue, on 21 January 1970 Ammerman sent Dworman a letter, which Dworman denies having received, enclosing a copy of the tax bills to which penalties had now been added and notifying Dworman that if the bills were not paid within 10 days, "appropriate action will be taken without further delay or notice to you."

During February, 1970, Ammerman testified that he had had several conversations with Dworman's office personnel, only because he had found it impossible to reach Dworman after the telephone conversations regarding the 1968 tax bill, informing them of the critical situation with respect to the taxes. During one of these conversations, Sapanakis promised to "send the money down," nevertheless, "It didn't come."

Mrs. Dreisonstok continued to receive delinquent tax bills; and on May 14th, 21st, and 28th the property was advertised for sale for non-payment of taxes with the sale scheduled for 8 June 1970. On 2 June 1970, Mrs. Dreisonstok paid the taxes and accrued penalties in the amount of $11,667.68. By letter of 18 June 1970, Mrs. Dreisonstok advised the Dworman Corporation that its lease had been terminated.[3] The ejectment suit was filed by Mrs. Dreisonstok on 26 June in the Circuit Court for Montgomery County; that same day, Mrs. Dreisonstok was presented with checks totalling $11,741.48 ($11,-667.68 for taxes and penalties with 8% interest) by Carl G. Rosinski Company, which was acting as agent for the Dworman Corporation. Pursuant to leave granted by the court on 30 June 1971, these checks were endorsed over to the clerk of the court and deposited in its registry.

The colloquy which follows, an excerpt from the deposition of Dworman which was read into the trial record, establishes that it was Dworman's policy not to pay taxes on time:

"Q * * * Can you tell us why it was that the 1968 taxes were not paid until seven months after they were due and after delinquent notices had been sent to you?

"A [Dworman] Because that's how we usually pay our taxes.

---

3. This was the letter which the lower court found to be inadequate notice of termination.

"Q You customarily pay taxes several months
after they are due?

"A [Dworman] Of course. Don't you?"

Later, on recross-examination at trial, Dworman ex-
plained this policy:

"* * * [W]e don't pay our taxes on time.
The government here has a firm procedure for
that whereby they charge you interest which is
a lower interest rate than the banks. So no
builder pays his taxes on time. He takes ad-
vantage of the low interest rate the communities
charge.

"* * * We did the same thing in '68. We took
advantage of it. * * *

"Payment of taxes is something that we al-
ways do, in all the building jobs until the build-
ing gets started, at the last possible moment
because we borrow the money at a very very
low interest rate in the community and there's
a regular procedure set up for that."

It will be noted that taxes were never paid when due
during the entire period of Dworman ownership of the
leasehold.

Dworman's cavalier attitude in respect of the lease
covenants is further evidenced by his failure to comply
with orders issued by Montgomery County requiring the
cutting of weeds and the removal of trash, which re-
sulted in this work being charged to Mrs. Dreisonstok.
There was some question, too, whether insurance poli-
cies had been properly endorsed to protect Mrs. Dreison-
stok.

The lower court, in its opinion and order granting
equitable relief to the Dworman Corporation, concluded:

"The only contention of significance on which
evidence was adduced by the plaintiff was the
failure of the defendant, as provided by the
lease, to pay the real estate taxes on the date

they become due. This occurred two successive years and on the second occasion the plaintiff paid the taxes herself shortly before the final tax sale date. The plaintiff contended that had she not paid the taxes on that occasion the property would have been sold at public sale. Apparently the jury believed this testimony and the Court will consider that fact in ruling on the equitable pleas. Undoubtedly the defendant was negligent in failing to pay these taxes but the Court is not convinced by a preponderance of the evidence that its failure was willful and deliberate."

Mrs. Dreisonstok asserts that the circuit court's finding that the Dworman Corporation's failure to pay the taxes on time was negligent, rather than willful, was clearly erroneous and we agree. By his own testimony, Dworman left no doubt that he had no intention of paying the taxes until the last possible moment. This was not a negligent or inadvertent oversight, it was a matter of policy, deliberately arrived at, and consistently followed, which led to the brink of a tax sale.

The crucial issue is whether this course of conduct should have effectively denied the Dworman Corporation the equitable relief which it sought.

The covenant of a tenant to pay taxes, like a covenant to pay rent, involves the payment of a sum of money which is ascertained, or readily ascertainable, 2 *Pomeroy's Equity Jurisprudence* § 454 a. (5th ed. 1941). Courts of equity treat the landlord's right to forfeiture for breach of such conditions as being, in effect, a mere security for the payment of the obligation. Thus, equitable relief is ordinarily granted upon the payment of the principal sum with interest and costs that have accrued, these payments being regarded as compensation for non-payment when the obligation was due, *Lombardo v. Clifford Bros. Co.*, 139 Md. 32, 36, 114 A. 849 (1921) ; *Wylie v. Kirby,* 115 Md. 282, 286, 80 A. 962 (1911) ; *Carpenter*

*v. Wilson,* 100 Md. 13, 22, 59 A. 186 (1904) ; 1 Tiffany, *Real Property* § 215 (3d ed. 1939).

The authorities consistently teach that although equitable relief against forfeiture will be afforded where a default in the payment of rent is due to fraud, mistake, surprise or accident, courts of equity are divided on the question whether they should intercede where the breach is due to gross negligence, or is willful and persistent, but none will grant relief against forfeiture where the tenant has violated fundamental principles of fair dealing, 49 Am. Jur. 2d *Landlord and Tenant* § 1091 (1970) ; 2 *Pomeroy's Equity Jurisprudence, supra,* §§ 450-52; 1 Tiffany, *supra* § 215; 3 *Story's Equity Jurisprudence* § 1740 (14th ed. 1918). There is no reason why the same rule is not applicable by analogy to the breach of a covenant to pay taxes when due.

The fair dealing rule was well stated in *Darvirris v. Boston Safe Deposit & Trust Co.,* 235 Mass. 76, 78, 126 N. E. 382 (1920) :

> "* * * The failure to pay rent when due was not once or twice, but was so settled a habit as to be rightly described as a general course of conduct. The circumstances of continued delay were annoying in nature and were accompanied by the frequent drawing of checks when there were no funds to meet them. This is not an instance of temporary financial embarrassment or fleeting willfulness of purpose. Much less is it the result of accident or mistake. When measured by the term of the lease, it has become a custom. The state of being behindhand appears to have been not only willful but contumacious. There is, however, no finding of bad faith.
>
> "It is a familiar maxim in equity that he who seeks equity must do equity. The plaintiff has made an express contract in writing for the payment of rent at specified times, with provision, in case of failure, for entry by the landlord. He

asks equity to relieve him from the consequences stipulated in his agreement to follow from failure to perform that obligation. While in the ordinary case of delayed payment of rent that will be done, equity will not interfere in his behalf where, as in the case at bar, the plaintiff has violated fundamental principles of fair dealing."

This holding should be read in light of the court's recognition of the rule stated in *Mactier v. Osborn,* 146 Mass. 399, 402, 15 N. E. 641 (1888) : "The result of the authorities, supported by sound principle, is, that where there has been a breach of a covenant to pay rent equity will relieve against a forfeiture although the breach is wilful on the part of the lessee," *Darvirris v. Boston Safe Deposit & Trust Co., supra* at 77.

The Dworman Corporation, as well as the court below, relies heavily on *Streeter v. Middlemas, supra,* 240 Md. at 173, in which we noted that "a court on equitable grounds has the right to restrain the forfeiture of a lease in a case where the loss caused by the forfeiture would be wholly disproportionate to the injury caused by the breach." The Dworman Corporation contends that forfeiture would be inequitable in this instance in light of the testimony establishing the current value of the leasehold as being in excess of $500,000.

It is true that the proportionate injury caused by the breach is one factor in the consideration of whether to grant equitable relief, and the court, in *Streeter,* was referring to the inequity which would result if commercial property worth $70,000 could be forfeited for non-payment of one month's rent of $583.33. In that case, where the trial judge found that the tenants' conduct had been "slipshod and irresponsible to the point of verging on the wilful" (240 Md. at 173), we noted that "the trial court went extremely far in attempting to prevent a forfeiture" (240 Md. at 176).

It is our conclusion that the Dworman Corporation's failure to comply with the terms of the lease and pay the

taxes when they became due was calculated, deliberate, willful, persistent, and violated the fundamental principles of fair dealing. Noting the entire circumstances of Dworman's conduct regarding Mrs. Dreisonstok, his repeated refusal to comply with, and in some instances even to respond to Mrs. Dreisonstok's demands, it may even have amounted to bad faith.

In light of this conclusion, and the fact that the Dworman Corporation did not tender payment until the day the ejectment case was docketed, a date after the tax sale would have been held, but for Mrs. Dreisonstok's intervention, we are firmly of the opinion that equitable relief should have been denied, *United States v. Forness,* 125 F. 2d 928, *cert. denied* 316 U. S. 694, 86 L. Ed. 1764, 62 S. Ct. 1293 (1942) ; *Bonfils v. Ledoux,* 266 F. 507, 16 A.L.R. 430 (8th Cir. 1920) ; *Darvirris v. Boston Safe Deposit & Trust Co., supra; Gordon v. Richardson,* 185 Mass. 492, 70 N. E. 1027 (1904).

It should be noted that Mrs. Dreisonstok died on 16 July 1971, after this appeal had been taken, and that her husband, Lewis Dreisonstok, as executor under her Will, and that John Davis, as successor trustee of the trust created by the Will of Mollie Shepard were, by order of this Court, passed on 13 December 1971, substituted for Mrs. Dreisonstok individually and as trustee.

> *Decree reversed, jury verdict*
> *of ejectment reinstated,*
> *costs to be paid by appellee.*