568 A.2d 1170

The MAXIMA CORPORATION

v.

CYSTIC FIBROSIS FOUNDATION, et al.

CYSTIC FIBROSIS FOUNDATION

v.

The MAXIMA CORPORATION, et al.

No. 696, Sept. Term, 1989.

Court of Special Appeals of Maryland.

Feb. 6, 1990.

---

7. In the exercise of our discretion, we direct all costs be borne by Mr. Lieberman.

**604**

Dale A. Cooter (Cooter & Gell, Washington, D.C. and David R. Smith, Rockville, on the brief), for appellant/cross-appellee, The Maxima Corp.

Peter Barnes (Swidler & Berlin, Chartered and Elaine R. Lubin, on the brief), Washington, D.C., for appellee/cross-appellant, Cystic Fibrosis Foundation.

Jack A. Garson (Stuart S. Greenfeig and Stein, Sperling, et al., on the brief), Rockville, for appellee/cross-appellant.

Argued before GARRITY, ALPERT and KARWACKI, JJ.

GARRITY, Judge.

This appeal involves a dispute over the provisions and implementation of a lease. The parties are 6933 Arlington Development Limited Partnership (hereinafter "Arlington"), the lessor, The Maxima Corporation (hereinafter "Maxima"), an assignee of the original lessee, and Cystic Fibrosis Foundation (hereinafter "Cystic"), a subtenant of Maxima. By order of March 7, 1989, the Circuit Court for Montgomery County (Raker, J.) found that Maxima had breached its lease with Arlington, and ordered it to pay damages to both Arlington and Cystic. Each party raises several questions for our consideration:

## MAXIMA'S QUESTIONS

I.   Whether the court erred in finding Maxima in breach of the lease and liable for damages;

II.  Whether the court erred in its measure of damages;

## ARLINGTON'S QUESTIONS

III. Whether the court erred in allowing Cystic to remain in possession of the leased premises despite its finding that Maxima breached the lease;

IV.  Whether the court erred in denying Arlington's claim against Cystic for hold over rent;

V.  Whether the court erred in denying Arlington's claim for refund of incentive payments made pursuant to the lease;

## CYSTIC'S QUESTIONS

VI.  Whether the court erred in denying Cystic's claims against Maxima for attorneys' fees and costs; and

VII.  Whether the court erred in denying Cystic's claim against Arlington for $170,000.00 in damages.

## FACTUAL BACKGROUND

On March 11, 1986, Arlington entered into a lease and addendum to lease (collectively referred to herein as "Master Lease") with Technassociates, Inc. (hereinafter "TI") for Arlington's building then under construction at 6931 Arlington Boulevard, Bethesda, Maryland. The premises leased were the entire second floor of the building ("Suite 200") and approximately 5000 square feet in the basement of the building (Space "T100"). Arlington and TI agreed on specifications for the construction of both spaces, and construction began on Suite 200. Completion was initially scheduled for August, 1986 but later moved to September, 1986.

Because Arlington considered Suites 200 and T100 difficult to rent, it offered TI various incentives to enter into the lease.[1] Among them, Arlington agreed to waive the first six months of rent; to pay $260,000.00 to Technassociates as a "Signing Payment" upon execution of the lease; to pay $260,000.00 as an "Occupancy Payment" upon TI's occupying the premises; and to pay a final $200,000.00 as an "Anniversary Payment" on the first anniversary of the commencement of the leased term.

In accordance with the lease, Arlington paid TI the Signing Payment. In May, 1986, Arlington also began preparing the leased premises for occupancy. Work continued on

---

1.  Suite 200 was evidently a floor with a poor view and T100 had no windows.

both the second floor and the basement until the end of June 1986. At that time, a representative of Maxima contacted Joel Fernebok, general partner of Arlington, and told him that Maxima had acquired TI and TI's interest in the lease, and that Maxima did not know if it would be moving into the leased premises. At that point, June 30, 1986, Arlington stopped preparation of the premises, leaving both suites approximately half completed.

TI then requested that Arlington consent to an assignment of the lease to Maxima and to a subletting of Suite 200 to the Cystic Fibrosis Foundation. In mid-July Arlington received an initial set of revised plans for Cystic's use of Suite 200. Those plans were finalized in mid-August, after which Arlington resumed preparation of Suite 200 alone. In a letter dated September 4, 1986, Arlington consented to a subletting of Suite 200 by Maxima to Cystic. On September 18, 1986, Maxima and Cystic entered into a "Sublease Agreement" which pertained only to Suite 200 and contained a termination date of August 31, 1992.

When Cystic moved into Suite 200 on October 3, 1986, Maxima demanded the $260,000.00 Occupancy Payment from Arlington. Arlington maintained that it was not obligated to make the payment because the T100 space remained unoccupied. Arlington further determined that Maxima was responsible for a 30–day delay in occupancy of the premises leased to Cystic. It offered Maxima part of the Occupancy Payment, nevertheless, if Maxima would acknowledge responsibility for the 30–day delay. In a November, 1986 letter Arlington tendered to Maxima a $204,441.55 check, the negotiability of which was conditioned on Maxima signing an attached addendum to the lease recognizing September 3, 1986 as the commencement date of the lease. Arlington sought such a recognition to establish that the rent payments for the entire leased premises would begin March 3, 1987 (following the six month waiver period). Maxima negotiated Arlington's check but

did not sign the attached addendum.[2]

On November 11, 1986, Maxima Vice President and General Counsel David R. Smith wrote the following to Arlington's counsel:

> Please be advised that TI/Maxima intends on occupying the 5000 square feet of space at the Leased Premises not sublet to Cystic on or about December 15, 1986. We have reviewed the Premises and noted that a substantial amount of work is yet to be done in order to effect occupancy. We believe that work must commence immediately.

On December 23, 1986, however, a Maxima representative offered Arlington $175,000.00 in consideration for being released from its obligations with regard to T100, an offer that Arlington rejected. In May, 1987 Maxima notified Arlington that, "[s]ince [Arlington] has stopped work on Suite T100, it is our belief that [Arlington] has breached [Arlington's] obligation to complete said suite in a timely manner; thus, we do not feel obligated to accept the premises if completed." Maxima qualified this position in June, 1987, however, by a letter that stated *inter alia*, "Maxima offers the same buy-out proposal it made previously."

In July, 1987, Arlington completed preparation of T100 pursuant to TI's original plans. By letter of July 7, 1987, Arlington notified Maxima that T100 was ready for occupancy. When Maxima did not occupy and pay rent for T100 by August, 1987, Arlington advised Maxima that it was in default of the lease and that Maxima had ten days in which to cure its default. In September, 1987, Maxima proposed a sublease of Suite T100 to Cystic, and in a letter of September 10, 1987, represented the following:

---

**2.** In March, 1987, Arlington notified Maxima that the six-month waiver of rent had expired on March 3, 1987. Maintaining that October, not September 3, 1986 was the commencement date of the lease, Maxima refused to pay rent for March 1987. Arlington thereafter filed suit, and on June 17, 1987, the District Court for Montgomery County found the commencement date to be September 3, 1986, and entered judgment against Maxima for unpaid rent, late charges, and interest, in an amount totaling $40,908.78.

Please be advised that tenant intends to be responsible for Suite T100 and honor our responsibilities and obligations as set forth in the Lease as of the date of the signing of the Sublease of T100 with Cystic Fibrosis Foundation contingent upon the Landlord's consent to the Sublease of Suite T100 with Cystic Fibrosis Foundation.

Arlington rejected this proposal, and on September 21, 1987, notified Maxima of a failure to cure the default that, in its view, entitled it to terminate the lease and hence Maxima's right to occupy the leased premises. On October 9, 1987, Arlington notified both Maxima and Cystic that the lease was terminated and that it would repossess the premises by November 30, 1987. Cystic responded by filing a complaint seeking a declaration that it was entitled to remain in Suite 200, and seeking a monetary award for tenant incentive payments. Maxima, in turn, cross-claimed against Arlington seeking damages for breach of the Master Lease, indemnity, and declaratory relief. Arlington completed the picture by counterclaiming against Cystic for holdover rent as to Suite 200, and cross-claimed against Maxima for indemnity. The trial court declared, *inter alia*, Maxima to be in default of its lease with Arlington and entered awards in favor of both Cystic and Arlington.[3]

## DISCUSSION

### I.

#### A. *Default and Failure to Cure*

The trial judge determined that Maxima was in default of its lease with Arlington by failing to occupy and pay rent on

---

3. The court ordered, as to Cystic, "that Maxima shall pay to Cystic One Hundred Seventy Thousand Dollars ($170,000.00) as, and for, the Anniversary Payment provided for under Maxima's sublease with Cystic for Suite 200, plus pre-judgment interest at a legal rate from September 18, 1987, and Thirty-two Thousand Five Hundred Fifteen and $^{65}/_{100}$ dollars ($32,515.65) for moving expenses plus pre-judgment interest at a legal rate from December 9, 1986." The court further awarded Arlington a total of $402,320.02 in damages against Maxima representing rent, late fees, interest and attorneys fees.

the T100 space. She also found that Maxima had failed to cure the default, stating:

> I find that Maxima told Joel Fernebok to stop building-out the T100 space because they didn't know what the use of that space would be. Based on all of the evidence that I have heard, I don't believe that Maxima intended to occupy T100, which is why they never directed him how to build it out, notwithstanding the November '86 letter to Joel Fernebok to build the space, or at the same time negotiating a buy-out. No rent has been paid by Maxima for the T100 space ... I find a breach on the part of Maxima, and I find that Joel Fernebok's failure to complete the buildout earlier was due to Maxima's conduct.... I find that Maxima did not cure but instead sought consent to sublet to Cystic which [Arlington] refused.... I find that [Arlington] did not unreasonably withhold their consent and that Maxima is in default, they paid no rent, and I believe they were stalling with respect to how they wanted it built out.

■ We review the trial judge's findings of Maxima's default and failure to cure under the clearly erroneous standard. *Messall v. Merlands Club, Inc.*, 233 Md. 29, 39, 194 A.2d 793 (1963). That standard requires that we decide only whether there is any competent, material evidence legally sufficient to support the trial judge's findings. In making this determination, we assume the truth of all the evidence and of all the favorable inferences fairly deducible therefrom tending to support the trial court's factual conclusions. *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 354, 517 A.2d 1122 (1986); *Carling Brewing Co. v. Belzner*, 15 Md.App. 406, 412, 291 A.2d 175 (1972).

■ Maxima contends first that the trial judge was clearly erroneous in finding that it was in default of the lease. Our review of the record, however, indicates that the evidence was sufficient to support the trial court's conclusion. Clearly, Maxima was initially to occupy T100 in September, 1986. Maxima specifically agreed, by negotiating the par-

tial Occupancy Payment from Arlington, that "the commencement date shall be deemed to be September 3, 1986 *for all purposes of the lease."* (Emphasis added). The T100 space was in no way exempted from what the parties deemed "the Leased Premises." In fact, David Smith of Maxima testified that when he demanded the $200,000.00 anniversary payment from Arlington, it was his belief that the payment was for both the T100 and Suite 200 spaces. Yet, it is undisputed that Maxima never occupied the space nor paid rent on it.

Maxima contends that the July, 1987, completion date of T100 was "simply too late" for it. The trial judge, however, believed and relied on evidence that indicated the delay in T100's completion was in fact due to Maxima. There was testimony before the court that a representative of Maxima told Joel Fernebok of Arlington to stop building out the T100 space because, at that time, Maxima did not know what the use of the space would be.[4] Further, Mark Berman of Interplan, Inc.,[5] testified that, in July of 1986, when revised plans were provided for the Suite 200 space, he received no instructions as to the preparation of the T100 space. This was confirmed by David Smith who testified that Maxima neither submitted plans for the preparation of T100, nor told Arlington to use the original plans prepared for TI's anticipated use of the premises. In short, we believe that the court's finding of a default as to T100 is supported by competent and material evidence.

Maxima next argues that any default that may have occurred as to Space T100 could have been cured by its

---

**4.** Maxima denies that its representative ever advised Arlington to stop work on the leased premises. The court, however, resolved this conflicting testimony in favor of Arlington. As we cannot deem her conclusion clearly erroneous, we will not reverse her finding. *Laird, Rock and Small, Inc. v. Campbell,* 200 Md. 627, 629, 92 A.2d 380 (1952).

**5.** Interplan, Inc., is a commercial space planning, interior design firm that was employed in 1984 to design both Suite 200 and T100 for TI, and in 1988 was employed to revise Suite 200 for Cystic's purposes.

proposed sublease of the space to Cystic. Maxima further contends that Arlington's refusal to agree to the sublease violated Section 22(a) of its Master Lease with Arlington. The trial judge, however, found Arlington's refusal reasonable, a finding that is again subject to a clearly erroneous standard of review.

Section 22(a) of the Master Lease states that Maxima cannot sublet any portion of the leased premises without the prior written consent of Arlington, "which consent shall not be unreasonably withheld or delayed." [6] As we have never specifically defined what constitutes "reasonableness" in this context, the parties present us with varying definitions of the term from other jurisdictions in which questions relating to commercial leases would be frequently entertained by a court.[7] The framework within which we view the authorities is perhaps best set forth in *American Book Company v. Yeshiva University Development Foundation, Inc.*, 59 Misc.2d 31, 297 N.Y.S.2d 156 (1969), in which the court wrote:

> reasons for refusal of consent by a landlord fall into two broad categories—objective and subjective. By "objective" are meant those standards which are readily measurable criteria of a proposed subtenant's or assignee's acceptability, from the point of view of *any* landlord ...
> ... Can the reasonableness or the unreasonableness of refusing consent vary with the identify and activities of the landlord? If so, we are relegated not to the objective

---

**6.** Maryland courts recognize provisions prohibiting unreasonable withholding of consent to a sublease. *Jacobs v. Klawans,* 225 Md. 147, 151–52, 169 A.2d 677 (1961).

**7.** We consider the cases of *F.H.R. Auto Sales, Inc. v. Scutti,* 144 A.D.2d 956, 534 N.Y.S.2d 266 (1988); *216–220 East 67th Street Associates v. Quinn, et al.,* 136 Misc.2d 188, 518 N.Y.S.2d 302 (1987); *Kendall v. Ernest Pestana, Inc.,* 40 Cal.3d 488, 220 Cal.Rptr. 818, 709 P.2d 837 (1985); *1010 Potomac Associates v. Grocery Manufacturers of America, Inc.,* 485 A.2d 199 (D.C.App.1984); *Fernandez v. Vazquez,* Fla.App., 397 So.2d 1171 (1981); and *Ringwood Associates Ltd. v. Jack's of Route 23, Inc.,* 153 N.J.Super. 294, 379 A.2d 508 (1977) *aff'd,* 166 N.J.Super. 36, 398 A.2d 1315 (1979).

standards by which any tenant may be measured, but to wholly subjective criteria which render effective judicial review difficult, if not impossible. To the extent that rejection of a proposed subtenancy is based on the supposed need or dislikes of the landlord, a policy of judicial disapproval of such subjective criteria is discernible.

*Id.* 297 N.Y.S.2d at 159–61.

Indeed, our review of the cases indicates that a landlord's refusal of a sublet request is generally only deemed reasonable if based on objective grounds. That is, a landlord is normally expected to act pursuant to reasonable commercial standards, without regard to subjective attitudes personal to the landlord. The case of *Kendall v. Ernest Pestana, Inc.*, 40 Cal.3rd 488, 220 Cal.Rptr. 818, 709 P.2d 837 (1985), for example, offered a short list of acceptable bases for a reasonable objection to sublet.

Examples of bases for such good-faith reasonable objection would be inability to fulfill terms of the lease, financial irresponsibility or instability, suitability of premises for intended use, or intended unlawful or undesirable use of premises.

*Id.* 220 Cal.Rptr. at 823, 709 P.2d at 842. Likewise, in *Fernandez v. Vazquez*, Fla.App. 397 So.2d 1171 (1981), the Court cited the following similar objective factors to be considered:

(a) Financial responsibility of the proposed subtenant,

(b) The "identity" or "business character" of the subtenant, i.e., suitability for the particular building,

(c) The need for alteration of the premises,

(d) The legality of the proposed use, and

(e) The nature of the occupancy, i.e., office, factory, clinic, etc.

*Id.* at 1174. Even in *1010 Potomac Associates v. Grocery Manufacturers of America, Inc.*, 485 A.2d 199 (D.C.App. 1984), the case that appellee urges on us, the court concluded that "the landlord has no reasonable basis for withholding consent if the landlord remains assured of all the benefits bargained for in the prime lease." *Id.* at 210.

Arlington asserts that it did not believe Cystic's subtenancy would secure it all the benefits of the Master Lease, primarily because Maxima refused to offer Arlington assurances that it would remain obligated on the premises. It points specifically to the above-mentioned letters from Maxima of May and June, 1987, in which Maxima stated that it was not obligated to, and did not intend to, lease the T100 space, due to what it considered Arlington's late completion of the premises. These statements, however, must be viewed in the context of the parties' ongoing negotiations as to T100.

After Maxima was notified by Arlington in July, 1987 that T100 was completed, it forwarded to Arlington a copy of its proposed sublease with Cystic, Section 7 of which provided:

> 7. *Liability of Sublessor*—Notwithstanding this Sublease Agreement, Sublessor shall remain liable to Lessor pursuant to the terms and conditions of the lease as specifically provided herein and in the case of default of Sublessee.

Arlington responded to the proposed sublease via two letters of September 9 and September 10, 1987 stating:

> The Sublease Agreement is inconsistent with your letter of August 28, 1987, whereby you clearly and unambiguously indicated that Maxima was no longer interest[ed] in the T100 space. I will need you to clarify your intention with respect to assuming responsibility [with] respect to T100. Our client cannot consider your request to sublet your space when you have taken the position that you are not obligated for the space.
>
> *        *        *        *        *        *
>
> Once again, it is my understanding that you have taken the formal position that Tenant does *not* intend to take possession of and be responsible for the obligations of Tenant with respect to Suite T–100 under the Lease. Since such is your position, your request for us to consider a sublease is inconsistent with that position.

If you unequivocally state your intention to be responsible for Suite T–100 and honor your responsibilities and obligations set forth in the Lease, our client would be willing to then consider your request relating to Landlord's consent of the sublease forwarded to us on September 8, 1987.

Maxima responded, in letters of September 10 and September 11, 1987, that it intended to be responsible for Suite T100 and honor its responsibilities and obligations under the Master Lease as of the signing of the sublease of Suite T100 between it and Cystic. The record indicates, then, that not only was Maxima liable to Arlington for T100 under the Master Lease, but it also confirmed that responsibility in the provisions of its proposed sublease with Cystic, and subsequent correspondence with Arlington. We do not comprehend, therefore, why Arlington would refuse to consent absent some further assurance from Maxima, and question the legal significance of any such proffer of further assurance had it been made by Maxima.

■ We hold that the trial judge erred when she found Arlington's refusal to agree to Maxima's proposed sublease reasonable. We reject Arlington's need for additional assurances and can decipher no legitimate objective reason for Arlington's refusal to accept Cystic when its subtenancy was first offered to Arlington. All parties agreed, and the trial judge specifically found, that Cystic was an excellent tenant as to Suite 200. Joel Fernebok of Arlington stated that "I have absolutely no objection to Cystic Fibrosis as a tenant in any property that I might own." Mr. Fernebok also stated that there was nothing in the proposed sublease "in and of itself" that would have caused Arlington any damage had they consented to it. Accordingly, as Maxima was improperly prohibited by Arlington from curing its breach, we believe that the trial judge was clearly erroneous in holding it liable for any damage incurred by Arlington from the point at which Cystic was presented as a subtenant to Arlington.

## B. *Assignment Versus Subletting*

■ The trial court found that the "Sublease Agreement" between Maxima and Cystic as to Suite 200 was indeed a sublease and not an assignment as both Maxima and Cystic contend.[8] In *Italian Fishermen, Inc. v. Middlemas*, 313 Md. 156, 545 A.2d 1 (1988), the Court reiterated the distinction between an assignment and a sublease:

> The common law rule governing the determination of whether a lease transfer is an assignment or a sublease is easily stated: If the instrument purports to transfer the lessee's estate for the entire remainder of the term it is an assignment, regardless of its form or of the parties' intention; however, if the instrument purports to transfer the lessee's estate for less than the entire term—even for a day less—it is a sublease, regardless of its form or the parties' intention.

*Id.* at 164, 545 A.2d 1. We apply this rule in reviewing the trial judge's finding that the "Sublease Agreement" did not convey Maxima's entire estate in Suite 200 to Cystic.

■ Both the trial judge and the District Court before her determined that, although Cystic did not occupy Suite 200 until October 3, 1986, the term of the Master Lease between Maxima and Arlington began on September 3, 1986. The lease term, then, was to end September 2, 1992. We have reviewed that finding earlier in this opinion and sustained it. Under the terms of Cystic's sublease with Maxima, however, Cystic's tenancy ends on August 31, 1992. The term of Cystic's sublease agreement, then, is shorter than the term of Maxima's lease. That fact itself indicates that Maxima and Cystic had a sublease.

---

**8.** Cystic argues that, if the sublease of Suite 200 is in fact an assignment, it would be entitled to the Anniversary Payment from Arlington regardless of a default on the part of Maxima. Maxima also argues for an assignment interpretation because, it contends, Cystic would then be in privity of estate with Arlington and Arlington would owe Cystic the Anniversary Payment and moving expenses.

Furthermore, Maxima's lease with Arlington required it to obtain Arlington's consent before it assigned its interest to another.[9] By letter of July 18, 1986, Maxima (through TI) requested "written consent to *sublet* the premises." (Emphasis added). An assignment was neither requested nor agreed to. We hold that the trial judge did not err in concluding that the "Sublease Agreement" was a sublease. *See Italian Fishermen, supra,* at 165, 545 A.2d 1.

### C. *Bifurcation of Master Lease*

Maxima argues that the trial court's judgment and its factual findings indicate that the Master Lease was bifurcated as between Suite 200 and T100. Hence, Maxima maintains, Arlington is liable to Maxima for the Suite 200 tenant incentive payments independently of the status of T100. Maxima contends that Arlington therefore breached the Master Lease by refusing to make the incentive payment.

What the court stated, however, was that "for most of the time the parties treated the lease as bifurcated," later qualifying that statement by adding, "they treated it that way for purposes of explaining my judgment." While she chose the "bifurcation" term for purposes of clarification, the trial judge nevertheless treated the lease as one lease, a portion of which had been breached, but one with remaining enforceable provisions. Based on the record before us, we are unable to hold that her determination of the existence of one lease was clearly erroneous.

### II.

The trial judge made the following damage award to Arlington and against Maxima:

---

**9.** Section 22 of the lease provides:
   Neither tenant nor its successors or assigns, shall transfer, assign, mortgage or encumber the lease, or sublet all or any portion of the Leased Premises, or permit all or any portion of the Leased Premises to be used by others without the prior written consent of landlord
   . . .

ORDERED, that Maxima shall pay to 6933 Arlington $402,320.02, consisting of the following:

a. for the time period from March 3, 1987 to November 30, 1987, Fifty-nine Thousand Four Hundred Forty-one and $^{43}/_{100}$ Dollars ($59,441.43), plus

b. for the time period from December 1, 1987 to August 15, 1988, Fifty-six Thousand Six Hundred Eight and $^{15}/_{100}$ Dollars ($56,608.15); plus

c. for the time period from September 1, 1988 to August 31, 1992, One Hundred Forty–Three Thousand Three Hundred Twenty-two and $^{15}/_{100}$ Dollars ($143,322.15); plus

d. for the time period from September 1, 1992 to September 2, 1997, any continuing difference in rent for T100 between that provided for under the Master Lease and that actually received by 6933 from the time period from September 3, 1992, through September 2, 1997, in the event the Master Lease is not terminated on September 2, 1992, and the amounts provided for at Paragraph 3 of the Addendum to the Master Lease based upon the minimum rent that would be applicable to the entire premises under the Master Lease, in the event the Master Lease is terminated on September 2, 1992; plus

e. operating costs and real estate taxes of Seventy-seven Thousand Six Hundred Twenty-two and $^{50}/_{100}$ Dollars ($77,622.50); plus

f. late fees and interest accruing from March 3, 1987 to November 30, 1987 of Nineteen Thousand Six Hundred Thirty-one Dollars ($19,631.00); plus

g. interest accruing from December 1, 1987 to August 15, 1988 of Eight Thousand Seven Hundred Thirty-four and $^{38}/_{100}$ Dollars ($8,734.38); plus

h. the late fees accruing from December 1, 1987 to August 15, 1988 in the amount of $2,830.41; plus

i. attorney's fees of Four Thousand One Hundred Thirty Dollars ($4,130.00) accruing during the time period from March 3, 1987 to November 30, 1987 and of Thirty

Thousand Dollars ($30,000.00) in this cause resulting from Maxima's default under the Master Lease.

Maxima argues first that Arlington was only entitled to damages representing their "lost profit," i.e., the excess of the rent recoverable under the breached lease over the sum that Arlington received by reletting the premises. That amount, Maxima further argues, should be reduced by the amount Arlington saved by avoiding payment of its pro-rated incentive payments. Maxima further argues that Arlington has in fact suffered no damage at all, as the slightly lower rental income it received via its reletting of T100 to Cystic is more than offset by the $253,000.00 in tenant incentives that it has been allowed to withhold due to Maxima's breach.[10]

In *Millison v. Clarke*, 43 Md.App. 75, 403 A.2d 384 (1979), Judge Lowe observed on our behalf:

> It is hornbook law in Maryland that a commercial landlord may hold a breaching tenant for the entire amount of the rent due under a lease without seeking to lessen his damages. It is equally accepted that he may mitigate by reletting without relinquishing his claim against the breaching tenant for the unmitigated rental.

*Id.* at 77, 403 A.2d 384 (citations omitted). In that Maxima was wrongly prevented by Arlington from curing its breach, however, we hold that Arlington may not recover from Maxima for any damage related to the T100 space beyond that incurred due to Maxima's failure to occupy the space from September, 1986 to September, 1987, the date it proposed to Arlington a subtenancy to Cystic. This neces-

---

**10.** Maxima submits for our consideration the following calculation. Under the lease between Arlington and Maxima, Arlington expected to collect $2,841,223.00 in minimum rent on both spaces but was to pay out $718,293.00 in cash tenant incentives (plus moving expenses). Arlington therefore anticipated a $2,122,931.00 net revenue. In Arlington's present position, however, (and even without considering the trial judge's damage award) it has received $2,666,595.00 in rent and paid only $464,442.00 in tenant incentives, thus netting $2,202,153.00 or $79,222.00 more than what it would have netted under the original contract.

sarily requires us to vacate those portions of the trial judge's damage award as between Maxima and Arlington relating to lost rent, operating costs, taxes, and attorney's fees. In remanding the matter to the circuit court for reconsideration of its damage award, we further note that, under the Master Lease, Arlington's obligation to make the tenant incentive payments remained even in the face of a default, so long as Maxima cured. We have held above that Maxima essentially cured, a cure that was improperly rejected by Arlington.

### III., IV. and V.

█ Arlington first argues that the court erred in not terminating Cystic's right to possess Suite 200. In this regard, the trial judge found as follows:

> Let me first say that the result of enforcing any lease forfeiture must not be unconscionable. Forfeitures are not favored in equity ... I do think it would be inequitable to forfeit the leasehold, and the court declines to do that, and therefore on the possession, based on equitable principles, I would grant judgment in favor of Cystic for possession.

It is clear that the trial judge had the discretionary power to relieve Cystic from forfeiture. *Rose and Crown Ltd. v. Shaw Enterprises, Inc.*, 28 Md.App. 548, 557, 346 A.2d 459 (1975). In *Dreisonstok v. Dworman Building Corp.*, 264 Md. 50, 284 A.2d 400 (1971), the Court stated:

> The authorities consistently teach that although equitable relief against forfeiture will be afforded where a default in the payment of rent is due to fraud, mistake, surprise or accidents, courts of equity are divided on the question whether they should intercede where the breach is due to gross negligence, or is willful or persistent, but none will grant relief against forfeiture where the tenant has violated fundamental principles of fair dealing.

*Id.* at 59, 284 A.2d 400.

█ We hold that the trial judge did not abuse her discretion in denying Arlington a forfeiture. The record indicates that Cystic, the party to be dispossessed by a

forfeiture of the Master Lease as to Suite 200, had candidly been regarded by Arlington as a model tenant. In fact, Arlington eventually elected to deal directly with Cystic on all matters regarding its tenancy, including collection of rent. Further, Cystic maintains its national headquarters in Suite 200, and a forfeiture would subject it to eviction. That result appears to us to inflict a disproportionate injury on Cystic, especially when Arlington, on remand, will be fully compensated for any damage caused by Maxima's breach as to T100. Finally, even if we were to impute Maxima's conduct to Cystic, we would not hold Maxima to have violated "fundamental principles of fair dealing." *Dreisonstok, supra.*

Indeed, Maxima was in legal breach of the Master Lease. Yet the record reflects a continuing attempt by the parties to achieve a settlement as to Maxima's obligations toward the T100 space. Maxima, for example, offered to pay Arlington in order to be released from its obligation regarding T100. Additionally, when Arlington formally tendered T100 to Maxima, Maxima immediately offered Cystic as a subtenant. In short, we affirm the trial judge's exercise of her equitable discretion in relieving Cystic from a forfeiture of Suite 200.

In its remaining two arguments Arlington maintains that the trial court erred in denying it an award against Cystic for holdover rent, and in denying its claim for a refund of the signing and occupancy payments. In that we affirm the trial court's determination that Cystic was entitled to remain in possession of Suite 200, Arlington's claim for holdover rent and refund of incentive payments are precluded.

## VI.

Cystic first argues that the trial court abused its discretion in denying Cystic's claim against Maxima for attorneys' fees. In pursuing its claim for fees, Cystic specifically relies on Section 15 of the Master Lease between Arlington and Maxima which is incorporated by reference into its sublease agreement with Maxima. That section provides:

In case Landlord or Tenant shall be made a party(ies) to any litigation commenced by or against the parties based on an act or omission of either party, then Tenant and Landlord shall protect and hold each other harmless, and shall pay all costs, expenses and reasonable attorneys' fees incurred or paid by the other in connection with such litigation. Tenant and Landlord shall also pay all costs, expenses and reasonable attorneys' fees that may be incurred or paid by the other in successfully endorsing the covenants and agreements in this Lease.

Although the general rule is that attorneys' fees are not recoverable by one party from an opposing party, there exists a well established exception to that rule which permits an award of attorneys' fees and other litigation costs based upon a contract between the parties. *Addressograph–Multigraph Corp. v. Zink*, 273 Md. 277, 288–89, 329 A.2d 28 (1974).

■ The trial judge indicated that she was not inclined to award Cystic fees because Cystic had instituted the action for declaratory judgment. The trial judge specifically stated: "With respect to Cystic, there was no court action taken by [Arlington] to cause them to leave; when they took the sublet, they only took part of the space, they brought this action for declaratory judgment. And the court will not award them counsel fees." We do not believe, however, that Cystic's institution of a suit it eventually won precludes it from benefiting from the terms of its agreement with Maxima. In light of the specific provisions for fees contracted for by Maxima and Cystic, we hold that the trial judge erred in denying Cystic its attorneys' fees.

## VII.

The Master Lease required Arlington to make an anniversary payment of $200,000.00 to Maxima on the first anniversary of the commencement date provided Maxima was not in default or provided it cured any default. Maxima assigned to Cystic Maxima's right to receive a portion of the

anniversary payment ($170,000.00) directly from Arlington. The trial judge denied Cystic's claim for the Anniversary Payment, apparently basing that denial on her finding that Maxima breached its lease with Arlington and did not cure. We now hold, however, that Maxima was prepared to cure but was prevented from doing so. Cystic is therefore entitled to the disputed portion of the Anniversary Payment.

JUDGMENTS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–THIRD BY ARLINGTON DEVELOPMENT LIMITED PARTNERSHIP, ONE–THIRD BY THE CYSTIC FIBROSIS FOUNDATION, AND ONE–THIRD BY THE MAXIMA CORPORATION.